CASE 45.—PROCEEDINGS BY THE COMMONWEALTH BY
    THE AUDITOR'S AGENT TO COMPEL THE LIST-
    ING OF PROPERTY OF THE WIDOWS' AND OR-
    PHANS' OF ODD FELLOWS.—June 28.

| 126  386 |
| f134  322 |

# Widows' and Orphans' Home of O. F. v. Commonwealth

Appeal from Fayette Circuit Court.

WATTS PARKER, Circuit Judge.

Judgment for plaintiff, defendant appeals.—Re-
versed.

Taxation—Exemptions—Charitable Institutions.—A corporation
    whose sole object is to provide a suitable home for the desti-
    tute widows and orphans of deceased members of a certain
    secret society of the State, is an "institution of purely pub-
    lic charity," within the meaning of Const. Sec. 170, and its
    property is exempt from taxation.

JOHN S. GRANT for appellant.

We insist that every incentive and motive that should influ-
ence good citizens in seeking a higher and better citizenship is
sought and worked for by this institution, and that instead of
burdening it with taxation the public should be willing to assist
them in accomplishing this object in every way they can, and in
considering the appellant not only as a purely public charity, but
also its educational features, it should not be burdened with tax-
ation: Trustees, etc. v. Taylor, Receiver, 25 Atl., 56; Fire Ins.
Patrol v. Boyd, 120 Pa. Stats., 624; Widows' and Orphans' Home
v. Bosworth, 25 Ky. Law Rep., 1505.

HOBBS & FARMER for appellant.

Brief not in record.

GEORGE R. HUNT for Commonwealth.

### AUTHORITIES CITED.

An institution intended to provide a home for destitute widows and orphans of deceased Odd Fellows of the State, and such other persons as that order may commit to its charge is a private charity and, therefore, not exempt from taxation under Sec. 170 of the Constitution, exempting from taxation institutions of purely public charity: Widows' and Orphans' Home of Odd Fellows v. Bosworth, Sheriff, 112 Ky., 200.

OPINION OF THE COURT BY JUDGE BARKER—Reversing.

This was a procedure by the Auditor's agent of the State of Kentucky, under the statute, to compel the listing, as omitted property, of a note for $4,000 owned by the appellant, the Widows' and Orphans' Home of the Odd Fellows of Kentucky. The one question arising for adjudication upon the record before us is whether or not the property of the appellant corporation is immune from taxation under that provision of section 170 of the Constitution which exempts "institutions of purely public charity." In other words: Is the appellant corporation an "institution of purely public charity?"

The object of the institution, as shown by its constitution, is to provide a suitable home for the destitute widows and orphans of deceased Odd Fellows of Kentucky. There is no dispute as to the facts of the case, upon which the question of law before us must turn. We copy the following excerpt from the answer, which is not denied: "It further says that it is the owner of a parcel of real estate consisting of 30 acres, a part of which is in the city of Lexington, and part in the county of Fayette, and being located at the head of West Sixth street in the city of Lex-

ington, known as the 'McMichael Place.' It further says that upon said real estate there are two houses, one a three-story and the other a four-story house, and said houses contain 107 rooms, including halls and cellar. That said land and said houses are used solely and alone for the purpose of caring for widows and orphans of deceased Odd Fellows of Kentucky. That there are now in said home and being cared for, boarded, clothed, educated, and trained for useful citizens, 61 children who are orphans of deceased Odd Fellows of Kentucky, and who have no means of support other than that furnished to them by defendant, and, in addition to said 61 children, there are 2 widows of deceased Odd Fellows who are indigent, old, and unable to protect or care for themselves, who are being maintained and cared for by defendant, being totally dependent upon the defendant for their support, and said children range in age from two and one-half years to sixteen years of age. It further states that, after its institution, it took some three or four of said children, from county and city institutions of charity, where they were being cared for by the counties or cities, and that in caring for said children and widows this defendant has relieved the said counties and cities from the burden of supporting, maintaining, and educating said children. That this defendant is engaged in a work of purely public charity, and that there are no religious, political, or sectarian rules adopted or prescribed for the admission of widows and orphans to said home. That the children in said home are permitted to go to whatever church they or their relatives may desire them to attend. That there is no creed or dogma of any church or denomination in said home. That Americans, Jews, Italians, or any children of th\*

white or Caucasian race, if their father was a member of an Odd Fellows'. Lodge in the State of Kentucky, are eligible to admission in said home. It further states that there is no person or persons who receive compensation or derive profit from the defendant corporation. That said board of directors elect a president, vice president, secretary, treasurer and superintendent. That the president, vice president, secretary, treasurer, and superintendent serve without compensation, and receive no pecuniary remuneration for their services, and there is no one who receives a salary who is connected with the management of said home and running same, except those who are in immediate charge of said home, and devote all of their time to the nurture and care of said children, to-wit, the manager and the matron, who are husband and wife, and live in the home and devote their entire time to the caring for the inmates of said home, and other employes who are necessary to properly care for the said inmates of the said home. It further says that it is an institution of purely public charity, and that no persons receive or derive any profit from it."

The question, then, is whether an institution whose charitable work is based upon the foundation shown by the foregoing excerpt from the answer is a "purely public charity." It may be admitted at the outset that the expression "purely public charity" is one which has not been uniformly defined by the courts before which it has come for construction, either under our own Constitution or under the Constitution of states having the same provision with reference to exemption from taxation as our own. The expression first came on for definition in our own state in the case of Trustees of Kentucky Female

Orphan School v. City of Louisville, 100 Ky. 470, 19 Ky. L. R. 1916, 36 S. W. 921, 40 L. R. A. 119. The Kentucky Female Orphan School is a charitable institution located at Midway, Ky., conducted under the auspices of the Christian Church, and in all substantial respects the question which we have here was presented there, and of necessity there arose the question of the meaning of the expression "purely public charity." The following excerpt from a case decided by the Supreme Court of Pennsylvania (Episcopal Academy v. Philadelphia, 150 Pa. 565, 25 Atl. 55) was quoted in the opinion with approval: "(1) Whatever is done or given gratuitously in relief of the public burdens, or for the advancement of the public good, is a public charity. Where the public is the beneficiary, the charity is public, and where no private or pecuniary return is reserved to the giver or to any particular person, but all the benefit resulting from the gift or act goes to the public, it is a purely public charity; the word 'purely' being equivalent to wholly. (2) A denominational school property, vested in trustees for the purpose of affording encouragement to the education of youth, is a purely public charity, although the school is not open in the same way to the general public as to persons connected with the religious denomination, but the general public are admitted as vacancies occur, and, when admitted, upon the same term with all other pupils. (3) An institution founded and endowed as a purely public charity does not lose its character as such under the tax laws if it receives a revenue from the recipients of its bounty sufficient to keep it in operation." The court also cites with approval the opinion in Burd Orphan Asylum v. School District of Upper Darby, 90 Pa. 21, as upholding the same principle announced in the

excerpt first quoted. In the last-named case a testatrix by her will had provided for the establishment of an asylum whose object was to maintain and educate white female orphan children "who shall have been baptized in the Protestant Episcopal Church in the city of Philadelphia, or in the state of Pennsylvania;" and this was held to be a "purely public charity," under the Constitution of Pennsylvania, which is identical with our own on this subject. In the case of Gerke v. Purcell, 25 Ohio St. 229, this definition of a "purely public charity" is given: "When the charity is public the exclusion of all idea of private gain or profit is equivalent in effect to the force of 'purely,' as applied to public charity in the Constitution." The case of Donohugh v. Library Company, 86 Pa. 306, and Philadelphia v. Women's Christian Association, 125 Pa. 572, 17 Atl. 475, maintain the same doctrine. In the case of Zable v. Louisville Baptist Orphans' Home, 92 Ky. 89, 13 Ky. L. R. 385, 17 S. W. 212, 13 L. R. A. 668, it is said: "It is the duty of the State to care for its indigent orphans, and, if done by another, he renders what is properly a public service, and the Legislature may therefore, without regard to the extent of it, exempt the property devoted to such use from taxation." In the case of Norton's Ex'rs and Trustees v. City of Louisville, 118 Ky. 836, 82 S. W. 621, 26 Ky. L. R. 846, was involved the question we have here. The charity of the defendant corporation, whose property was sought to be taxed by the municipality, was limited by the following language of its charter: "The object of this corporation shall be to procure the control of orphans and destitute children of Baptist parents, and of such other destitute and helpless children as the managers may think proper to receive, for the

purpose of supporting and educating them in an institution to be prepared and provided for that purpose by said managers. * * *'' It was there held that the institution in question was a purely public charity. In the case of Commonwealth v. Thomas, Trustee, 119 Ky. 208, 83 S. W. 572, 26 Ky. Law Rep. 1128, we thus defined the expression ''purely public charity,'' as contained in the Constitution: ''Without undertaking to be technically accurate, a 'purely public charity' may be defined as one which discharges, in whole or in part, a duty which the Commonwealth owes to its indigent and helpless citizens. Undoubtedly, it is the duty of the State to educate its poor children, and thus fit them for discharging the duties of citizenship; to care for the indigent insane, its helpless orphans, and its poor who are sick and afflicted; and therefore any institution which, serving no selfish interest discharges, in whole or in part, any such duty, is a 'purely public charity.' Under this head would come schools for orphans, the property of the organization known as the Young Men's Christian Association,'' etc.

When section 170 of the Constitution was before the convention for adoption, many of the members were apprehensive that the expression ''purely public charity'' was too narrow that, under it just such institutions as the one involved here would be taxed. This position was combated by one of the most distinguished lawyers in the convention, and in a speech which he delivered in support of the adoption of the section he used the following language: ''It is objected that the language which provides that institutions of 'purely public charity' shall be exempted from taxation is too limited in its meaning. It has been said, if this section is adopted, that the Masonic

Widows' and Orphans' Home of Louisville, the Baptist Orphans' Home, and other similar charities, will be taxed. I deny it, and, if I believed for one moment that the Masonic Widows' and Orphans' Home at Louisville, or the Little Sisters of the Poor, or other institutions of a like character throughout the State would be taxed by this section, I would be ashamed to record my vote in its favor. What is an institution of 'purely public charity'? It is some place owned or given or donated for a charitable purpose, and where persons receive benefit without cost to them, and which is not run for private gain or profit. The Masonic Widows' and Orphans' Home, and other institutions of that character in this State, are clearly objects of purely public charity. The charity may be limited to certain persons—such as the children and widows of deceased Masons, or orphans of deceased Odd Fellows, or children of a certain denomination—but the courts of other states, in whose Constitutions may be found this precise language, have held that institutions of this kind ought not to be taxed, and could not be taxed, because they were places of purely public charity; because they were, in the first place, affording certain persons, without any tuition fee or expense whatever, the means of obtaining an education or a livelihood; and in the second place, no person whatever derived from them any gain or profit. It has also been said that parochial schools owned by private denominations, but from which no gain or profit was derived by any person, and where no fee was exacted to enter, came under the head of purely public charities, and I am satisfied that the enlightened jurists who preside in the courts of our State would give to the language 'purely public charity' its broadest and most liberal mean-

ing, and would construe it as it has been by the able courts of our sister states; and, that being so, no gentleman on the floor of this convention need have any fear in his mind about taxing these institutions that are maintained by charity, and from which no gain or profit is derived, and which are a credit to our State, and an honor to its generous people." Debates Constitutional Convention, p. 2499. In the same debate, another distinguished lawyer cited and read long excerpts from the several cases decided by the Supreme Court of Pennsylvania, which are approved in Trustees of Kentucky Female Orphan School v. City of Louisville, supra, as showing the construction which had been given the expression "purely public charity" by the highest court of the State of Pennsylvania, whose Constitution, as said before, on the subject in hand, is identical with ours, and includes within its meaning such institutions as that at bar; and with this judicial construction before them the convention adopted section 170, with its exemption of "institutions of purely public charity."

We recognize that the language used by the members of a constitutional convention in debate does not afford the best criterion for the proper construction of the Constitution which is the subject of the debate; but it sheds some light, and we think the fact that the decisions of the Supreme Court of a sister state, construing language identical with that which the convention had before them, was read to the convention, and afterwards it adopted the particular language without change, ought to have some weight in reaching the conclusion that the definition given by the judicial tribunals of the sister state was the meaning which the convention intended should be placed upon the expression under consideration. It

is a well-established principle of statutory construction that, where any particular language or phrase has received a definite judicial construction, and is afterwards re-enacted, the judicial construction is presumed to be read into the new statute as a part of it; and this rule has been carried to the extent that, where a statute of one state which has received a settled judicial construction is enacted by another state, the construction is adopted as a part of the act. In speaking of this principle, Endlich, in his work on the Interpretation of Statutes, says: "One of the most important bearings, possibly extensions of the rule in question, is its application to statutes transcribed from the statute book of another state or nation. Thus it has been held that, where Congress or the Legislature of a state enacts a statute which is a transcript of an English act that has received a known and settled construction by the courts of that country, that construction, at the time of such enactment, is to be deemed as accompanying and forming an integral part of the same. And the same rule applies as to statutes copied from the statute books of other states. Indeed, it is laid down that, whether passed by the Legislature of the same state or country, or by that of another, the terms of a statute which have acquired a settled meaning by judicial construction are, when used in a later one, to be understood in the sense so attributed to them."

It is earnestly insisted that, in the phrase under consideration, the word "purely" qualifies and limits the word "public," and that no charity is to be considered "purely public," in which the general public is not permitted, at least in theory, to participate; that a charity which is limited by the terms of its organization or endowment to one class or sect of the

community is a private charity, and therefore not exempt from taxation. In this view we cannot concur. Not only is it opposed to the meaning of the phrase as interpreted by our own opinions above cited, but it is opposed to the manifest spirit and intention of the Constitution itself. No one will dispute that it is the duty of the State to support and educate its destitute orphan children. This is incumbent upon the State, not only because of the duty owed to the children, to rear and educate them into useful men and women, but because of the duty owed to the public at large that they shall not be allowed to degenerate by neglect into criminals, and thus become a menace to the peace and safety of the community, and an enduring burden upon the public anxiety and treasury. This being true, how must this public duty be performed? Manifestly, either by an involuntary system of taxation upon the property of all the citizens in the State or the taxing district wherein the charity is to be maintained, or by the voluntary contributions of the charitable portion of the community, an example of which is afforded in the institution under discussion. Now, it is obvious that every dollar contributed by individuals, intelliigently expended in maintaining such institutions as we are now contemplating, is a dollar saved to the general public, who would otherwise be forced to raise it by voluntary taxation. This being true, it is clearly to the interest of the State to foster and encourage voluntary contributions to be used in bearing the public burdens. Every dollar so raised is a gift to the State, for it discharges a debt due from it to the needs of its destitute children. Is it possible, then, that the framers of the Constitution, who were wise and patriotic men, meant to discourage gifts to the

State by levying an ad valorem tax on the gift? As a financial scheme, this might find a parallel in a tax on bequests endowing public schools, but not short of it. We do not believe the convention meant to station a taxgatherer at the door of the human heart, and thus confine charity a prisoner in her own home. The convention meant by the word "purely" to describe the quality of the charity, rather than the means by which it is administered, that it should be wholly altruistic in the end to be attained, and that no private or selfish interest should be fostered under the guise of charity; but it was never meant that, because a charity was limited by its terms to objects belonging to a certain sect or fraternal order, or color or class, it was a private, and not a public, charity. The members of the convention were wise and practical, and knew that men, as a rule, administer their charity through the organization or organizations to which they belong. Thus, Catholics will naturally distribute their charity through the organization of the Catholic Church; Presbyterians through those of the Presbyterian Church; Masons through the organization of the Masonic Order, etc., etc. But, while each is discharging for the State a particular and limited part of its duty to the objects of the public's bounty, together they are fulfilling the State's whole duty far more completely and efficiently than could be done by means of a system of involuntary taxation administered through the hands of hired officialism. The difference between these two systems— the one actuated by love, and the other serving for pay—is as marked as the difference betwen the ministrations of a mother at the bedside of her sick child and that of a hired nurse. If one fixes his eye narrowly on the work of only one of the various bodies and organ-

izations engaged in relieving the necessities of mis-
fortune, he might reach the conclusion that it was
not a public charity, because limited (in theory, never
in actuality) to the members of the particular order
or body; but he would make the mistake of one who
would conclude that, because a regiment of a battle
line had a flag bearing a name or number different
from the other flags in the line, it was not a part of
the army as a whole, and was not engaged with the
other regiments in the mutual purpose of resisting
the common enemy. The charities of the various
religious and fraternal organizations we are contem-
plating may seem, when viewed separately and with a
narrow and atrabilious vision, to be too limited in
their ministrations to be called public; but, when
vewed as a whole, the compass of their good work is
as wide as the circle of human suffering, and as uni-
versal as the love of the heart of man.

Seeing, then, that the various charities, which the
generous portion of the community administer
through the separate organizations to which the
donors belong, as a practical proposition cover the
whole field of the State's duty to her indigent and
helpless citizens, and that they together contribute to
the whole public burden, where would be the wisdom
in discouraging such charity? And what good pur-
pose can be subserved by indulging in a strained
construction of a phrase in order to reach the con-
clusion that the members of the constitutional con-
vention meant to throw away as useless the powerful
aid which the State could otherwise enjoy in the con-
tributions of charitable men? What good purpose is
subserved in attaching the word "private" to the
charity of Catholics for Catholics, Presbyterians for
Presbyterians, Masons for Masons, or Odd Fellows

for Odd Fellows?  Are the poor and helpless of these various bodies and organizations any less worthy, or any less a part of the public, because they are also members of the particular church or society to which they belong?  Are not all charitable institutions necessarily limited to the relief of only a small part of the destitute public?  Can any one institution administer to the wants of all?  And, if this be true, is it necessary to brand as "private" a charity which, by its terms, marks out a particular part of the public field in which it is to be administered?  Who would say that an orphan asylum endowed for the benefit of colored children only was a private charity, or that an orphanage for destitute white children only was not public?  And yet the operation of each would be exclusive of a large portion of the community.  Who would say that a home for poor and aged men was a private charity, or a home for poor and aged women was not a public charity, although manifestly excluding, the one of the female, and the other the male, indigent, from participation in the bounty?

We are of opinion that the framers of our fundamental law were practical statesmen, and they desired to avail themselves of all the benefits to be derived from the natural impulses of the charitable hearts of the citizens of the State; that they recognized that this benefit would be most certainly received if charity was allowed to flow through its natural channels, which are the organizations to which the donors belong; and that it was well recognized and understood that the general result would be that all, or nearly all, of the State's destitute, would thus be cared for far better than by the State's undertaking to maintain them by a system of involuntary taxation.

And we cannot believe that these wise and practical statesmen meant to tax the contributions of charity which so certainly take the place of taxation itself. To tax the contributions of charity for maintenance of the State's poor and helpless in wisdom is on a parity with the taxation of the money raised by the State by taxation for the same purposes. In other words, it would be taxing the proceeds of taxation. If we would realize what benefit the State derives from the charitable contributions of individuals, let us imagine that all of the institutions in the Commonwealth such as that at bar were closed, because the contributions sustaining them were withdrawn, and then calculate what would have to be raised by involuntary taxation either to support the charities, or to erect new jails, penitentiaries, and gallows to restrain and punish the additional crime with which the community would be inundated by the immense increase of the criminal classes. Those who contend for the construction rejected by this opinion would stand aghast at such a consummation. It is not believed that any one would uphold such a construction, but for his well-founded belief that no adverse legislation can check the dynamics of love, and that the additional benefit the selfish would obtain by taxing the proceeds of charity will be borne by the generous, rather than that the deserving poor should suffer. The case of Widows' and Orphans' Home of Odd Fellows v. Bosworth, Sheriff, 112 Ky. 200, 65 S. W. 591, being out of harmony with the views herein expressed, is overruled.

The judgment taxing the appellant's property is reversed, with directions to dismiss the proceedings against it.

DISSENTING OPINION BY JUDGE HOBSON.

The court quotes from Kentucky Female Orphan School v. Louisville, 100 Ky. 470, 19 Ky. Law Rep. 1091, 36 S. W. 921, 40 L. R. A. 119, but it ignores the fact that that case, as was held in City of Newport v. Masonic Temple Ass'n, 108 Ky. 341, 21 Ky. Law Rep. 1785, 56 S. W. 405, 49 L. R. A. 252, involved an educational institution and turned upon other grounds. In Norton's Ex'r v. Louisville, 118 Ky. 836, 82 S. W. 621, 26 Ky. L. R. 846, the charity was not limited to any sect or class, but was for "such other destitute and helpless children as the managers may think proper to receive." See Episcopal Academy v. Philadelphia, 150 Pa. 565, 25 Atl. 55. In Com. v. Thomas, Trustee, 119 Ky. 208, 83 S. W. 572, 26 Ky. Law Rep. 1128, the fund was set apart for the preaching of the Gospel. There was no limitation to any class. The court gravely quotes from certain cases in Pennsylvania. The Constitution of that state is like ours, and these declarations would seem therefore apposite. But the court ignores the fact that the courts there have discarded the dicta quoted, and that in Pennsylvania institutions like appellant are taxed. See Philadelphia v. Masonic Home, 160 Pa. 572, 28 Atl. 954, and cases cited. The court also quotes from an Ohio case, and in like manner ignores the fact that the authorities in Ohio are in accord with those in Pennsylvania. Gerke v. Purcell, 25 Ohio St. 229; M. S. Lodge v. Mayslip, 23 Ohio St. 144. The case of Zable v. Louisville Baptist Home, 92 Ky. 89, 13 Ky. Law Rep. 385, 17 S. W. 212, 13 L. R. A. 668, was decided before the adoption of the present Constitution, and therefore is not in point. These are all the authorities relied on for overruling a previous decision of

the court, except the speech of one of the delegates in the constitutional convention. In Cooley on Constitutional Limitations, side page 66, it is sad as to the value of the debates in the convention: "Where the question is one of abstract meaning, it will be difficult to derive from this source much reliable assistance in interpretation." The reason is plain. It is the people's Constitution. They accept it upon its terms, "and it is not supposed that they have looked for any dark or abstruse meaning in the words employed." The court gravely asks: "Are not all charitable institutions necessarily limited to the relief of only a small part of the destitute public? Can any one institution administer to the wants of all? * * * Who would say that a home for aged men was a private charity, or a home for poor and aged women was not a public charity?" If the court had read its own opinion in City of Newport v. Masonic Temple Ass'n, 108 Ky. 333, 20 Ky. Law Rep. 1785, 56 S. W. 405, 49 L. R. A. 252, it would have found a full answer to all of this.

The court says: "The convention meant by the word 'purely' to describe the quality of the charity, rather than the means by which it is administered; that it should be wholly altruistic in the end to be attained; and that no private or selfish interest should be fostered under the guise of charity." To say this is to strike from the constitutional provision the word "public" and substitute the word "pure" for the word "purely," so as to make it read "institutions of pure charity," instead of "institutions of purely public charity," as written. Every one knows there are "purely private charities" and "purely public charities." Only the latter by our Constitution are exempted from public taxation. If the court

may strike out the word "public," why not strike out also the word "charity," or any other word that may not in future meet the approval of the court as then constituted? The only value of a written Constitution is in its being taken according to its terms. The South American Republics have Constitutions as good as ours, but they amount to nothing, because they are construed by each faction according to its sentiments, rather than the plain ordinary meaning of the words used. I have no quarrel with much of the fine sentiment of the opinion, but good rhetoric may not be good law. This court is not a constitutional convention, and the question is not what the law ought to be, but what it is according to the terms in which the Constitution is expressed. Certain it is that from the fundation of the State, to the adoption of the Constitution, the law had been as laid down now by the court. The words of the law were familiar, and had often been construed by the court. Under the old law institutions of charity purely, whether private or public, were exempt. The old phraseology was abandoned, and new words used confining exemptions to institutions of "purely public charity." See Orphans' Home v. Bosworth, 112 Ky. 200, 65 S. W. 591, 23 Ky. Law Rep. 1505. When only institutions of purely public charity were exempted, would not a person of ordinary understanding conclude that institutions of private charity were not exempted? If appellant is not a purely private charity, where in the State will one be found?

"While there are decisions to the contrary, the preponderance of authority is in favor of the doctrine that an exemption of benevolent and charitable institutions does not extend to a society which confines its benefits to members or their families." 12

Am. & Eng. Ency. 343, and see cases cited in note. The decisions referred to holding to the contrary are from states where the words "purely public" are not used in the law defining the exemptions. The phrase "purely public charity" is a common one in American statutes and Constitutions, but the court is without precedent in any of these states for overruling a former opinion and construing away the plain terms of the Constitution. While only the case of Orphans' Home v. Bosworth, 112 Ky. 200, 65 S. W. 591, 23 Ky. Law Rep. 1505, is expressly overruled, the case of City of Newport v. Masonic Temple is in effect overruled by the opinion, for the two cannot stand together, as the reasoning of the one is precisely opposite to the reasoning of the other.

I therefore dissent from the opinion of the court. NUNN, J., concurring.