## City of Dayton v. Trustees of Speers Hospital.

(Decided May 26, 1915.)

Appeal from Campbell Circuit Court.

1. Taxation—Charities.—An institution, which was founded and endowed for a charity, and is so conducted, that the public receives all the benefits, and no private gain is received by any one, nor is intended to be received by any one, is a purely public charity, and not subject to taxation.

2. Taxation—Charities.—The fact that an institution founded and conducted as a charity, receives compensation from some of the recipients of its benefits, which are used in its conduct, does not change its status as a purely public charity.

3. Charities—Public Charity.—To assist in bearing the burdens of government is a public charity.

HUBBARD SCHWARTZ for appellant.

KELLY & REGENSTEIN for appellees.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

This is an appeal of the city of Dayton, Kentucky, from a judgment rendered by the Campbell Circuit Court, in an action by the city against J. O. Jenkins, John L. Phythian, and W. E. Senour, trustees of the Speers Hospital, in which the city sought to procure a

decree of sale of the hospital, in satisfaction of taxes assessed against it by the officials of the city, for the years 1910 and 1911. The defense offered by the appellees was that the hospital was an institution of purely public charity, and the case resulted in a judgment dismissing the petition of appellant. The case was tried upon an agreed statement of facts, which are, in substance, that the taxes for the benefit of the city were regularly levied upon the hospital for the years mentioned, in the first of which years the taxable value, at which it was assessed, was $28,000.00, and the second year $38,000.00, and the whole amount sought to be recovered was $1,100.50, as taxes due from it to the city for the years mentioned. The hospital was founded by funds set apart for that purpose by the will of Elizabeth L. Speers, who died in 1894, and whose will was duly probated October 20th, 1894. The item of the will which set apart the funds for the erection and maintenance of the hospital, after providing that the various specific legacies devised in the will to various persons, should be paid, and all costs and expenses incident to the settlement of her estate, "conveyed and transferred the entire balance of her estate, real, personal, and mixed of every kind, wherever situated, to Dr. B. K. Rachford, Dr. C. B. Schoolfield, and William C. Pickering, as trustees, in trust, for the establishment and maintenance of a hospital in the city of Dayton, Campbell County, Kentucky. Said hospital to be erected and maintained, and conducted in such a manner, and upon such plan, as, in their judgment, would do the greatest good. Said trustees shall annually report all of their acts and doings to the highest court in said county, having original equitable jurisdiction, and all vacancies in said trustees shall be filled by said court. Said court shall require from said trustees proper bonds, for the performance of their duties, and it may allow them annually, out of the trust funds, a just and fair compensation for their labor, etc." In pursuance to the trust thus created, the trustees and their successors erected the hospital at a cost of about $72,000.00, which left real estate of the value of $14,200.00 situated in Ohio, which also passed into the hands of the trustees. The receipts of the hospital, with the rents of the property, in Cincinnati, were not sufficient to pay its operating expenses, and its doors were closed, but in 1901 the present trustees were ap-

pointed, and they applied to the Campbell Circuit Court for permission to borrow $6,000.00 to pay its debts, and $2,000.00 additional with which to make needed repairs. The trustees borrowed the $8,000.00 from J. J. Ellerhorst, and thereafter they borrowed from Ellerhorst $2,250.00 additional, making $10,250.00, to secure which they gave a mortgage for that sum upon the real estate situated in Cincinnati, Ohio, and while the income from that property did not quite pay the interest on the Ellerhorst mortgage, he accepted same in full satisfaction of it. In 1909 it became necessary to provide a more commodious and convenient building for the nurses at the hospital, and the trustees again applied to the Campbell Circuit Court and received permission to borrow $20,000.00 for that purpose, and to secure it by a mortgage upon the hospital itself. $16,453.36 of this fund was expended in erecting the necessary additional building, and the remaining $3,546.64 was put in the treasury of the hospital, and used to pay accumulated debts and the operating expenses of the institution. There was another debt of $1,000.00 due one Langendorfer, incurred in building the nurses' addition to the hospital, and Langendorfer had secured his claim by filing a mechanics' lien upon the hospital property, and to satisfy this claim the circuit court authorized the trustees to place another mortgage upon the property for that sum, which was done in 1912. The average number of patients cared for in the hospital each day in 1910 was thirty-three, of which number nineteen were private patients and fourteen public patients, and the average number of patients cared for in 1911, each day, was twenty-seven, of which number fourteen were private patients and thirteen were public patients. In the year 1910 the city of Dayton sent to the hospital and paid for twenty-one patients, who remained there an aggregate of three hundred and fifty-eight days, and in 1911 it sent twenty-one patients to the hospital, who remained an aggregate of four hundred and thirty-two days. Private patients are those who enter the hospital and pay from their own resources for their rooms, board, and nursing, and pay the physician, for professional services rendered them, directly. The profit, if any, derived from the care of these private patients, for their rooms, board, and nursing, goes into the general fund of the hospital, and is used for maintaining the hospital. Public patients

are described as those who come of their own accord, or are sent by the authorities of the city of Dayton, Bellevue, Newport, and Campbell County. All public patients are received and treated in the public wards. No patients are kept in the hospital without charge, but some patients, who come of their own accord, fail to pay their bills. All public patients receive medical attention at the hands of the members of the hospital staff, free of charge to them, and one interne is on duty at all times, and his services are, also, given to the patients. The hospital trustees serve and have always served without compensation. When the hospital first began operation a number of rooms were furnished by charitably inclined persons and organizations, and since that time other rooms have been furnished in a similar manner. The hospital each year receives from various sources, charitable contributions in the way of beds, towels, furniture, food supplies, and various necessities, which have been used for the benefit of all the patients in the operation of the hospital. The hospital is located in the central part of Dayton, and has the benefit of the sewerage system of the city of Dayton, and such police and fire protection as is furnished any other building in the city. The hospital pays the same for water, gas, and electric light and power service as is paid by other consumers. Each year, during its operation, the hospital has received contributions of money, which are used in the operation of the hospital.

The agreed statement of facts further shows that for several years, before the year 1910, the cities of Dayton and Bellevue contributed annually to the hospital the sum of $1,000.00, and the city of Newport contributed annually to the support of the hospital $3,000.00, and the county of Campbell contributed annually the sum of $1,000.00. These contributions were made to the hospital upon condition that the indigent sick of the three cities named and of the county were to be received at the hospital and treated there without charge to them. This plan continued for several years, when it was changed, so that the cities of Dayton, Bellevue, and Newport paid $1.05 per day for each indigent person sent to the institution by them, but in the year 1913 the city of Newport paid $3,500.00 for that year, while the county of Campbell continued to donate $1,000.00 per year, as theretofore. The hospital trus-

tees have given to the cities of Dayton and Bellevue notice that after March 1st, 1914, the rate to be paid for each patient per day was to be $1.20. The actual cost per day for caring for each patient has been $1.28 per day. During the year 1910, in addition to the public patients received from the three cities named and Campbell County, three persons came of their own accord, who remained an aggregate of twenty days, and in 1911 three such patients were treated for an aggregate of thirty-three days.

It was, also, agreed that the earnings of the hospital for the year ending August 31st, 1909, for board, operating, nursing, rents, donations, miscellaneous receipts of all kinds, and discounts earned, amounted to $18,720.69, while its expenses for the same time for wages, provisions, fuel, water, and light, surgical supplies, drugs, house supplies, repairs, interest, insurance, and general expenses amounted to $17,032.89, which, after deducting $861.45 for persons treated free of charge, left a balance in favor of the institution of $826.35; for the year ending August 31st, 1910, the receipts of the hospital amounted to $18,067.03, and deducting the expenses for the same period from it, left a net deficit for the same year of $147.87; deducting the expenses from the earnings for the year ending August 31st, 1911, showed a net gain for the year of $184.14. A statement of the earnings and expenses for the year ending August 31st, 1912, showed a net balance in favor of the institution of $126.43.

This court, in Trustees of the Kentucky Female Orphans School v. City of Louisville, 100 Ky., 470, and in Widows and Orphans Home of Odd Fellows v. Commonwealth, 126 Ky., 386, quoted with approval from the case of Episcopal Academy v. Philadelphia, 150 Pa. St., 565, wherein it laid down, among others, the two following rules by which to determine whether an institution was one of purely public charity:

"First: Whatever is done or given gratuitously in relief of the public burdens or for the advancement of public good, is a public charity. Where the public is the beneficiary, the charity is public, and where no private or pecuniary return is reserved to the giver or to any particular person, but all the benefits resulting from the gift or act go to the public, is a purely public charity, the word 'purely' being equivalent to 'wholly.'

"Third: An institution founded and endowed as a purely public charity does not lose its character as such, under the tax laws, if it receives a revenue from the recipients of its bounty sufficient to keep it in operation."

In the case of Gerke v. Purcell, 25 Ohio St., 229, the Ohio Supreme Court said:

"When the charity is public, the exclusion of all idea of private gain or profit is equivalent in effect to the force of 'purely,' as applied to public charity in the constitution."

Another test of purely public charity is the object for which it was founded. If it was for the general public good, and not for private gain, and was so conducted that the public received all the benefits of it, it is a purely public charity. Donohugh v. Library Co., 86 Pa. St., 306.

By the will of Elizabeth Speer, the funds for the establishment and maintenance of this hospital in the city of Dayton were set apart by her, and the hospital to be erected and maintained, was to be conducted in such a manner and upon such a plan, as, in the judgment of the trustees, would do the greatest good. No provision is in the will providing that the funds so set apart should ever revert to any private person, or should in any event, ever, be used for any purpose, except the one designated in the will. The title to the property is vested in trustees, who have no personal interest in the property, whatever, and in the case of vacancies in the office of trustees, the vacancies must be filled by the circuit court of the county. The purpose of the donor was to create a pure charity, and the fund was placed in the service of the public without any view to provide gain for any one. The nursing and medical treatment of the indigent sick, and of those whose pecuniary circumstances are such, as will not justify an expenditure of more than a small sum for medical and surgical treatment, and nursing and caring while sick, is, without question, a public charity, if the doors of the institution are open to all persons, alike. It is always the duty of the State to provide for its indigent sick.

It does not appear that it was ever intended, that any private gain should result to any person in the operation of the trust created by the donor, in setting apart the fund for the erection and maintenance of the

hospital. The supervision of its operation was given to the court of the highest equitable jurisdiction in the county, and the power to name the trustees was vested in the same tribunal—thus stamping it with evidences of its public character. In its operation no one has been excluded from its benefits. The county in which it is situated and the nearby cities have used it as an instrumentality to care for their indigent sick, and to procure surgical and medical treatment for them. It is true, the county and cities have compensated the institution for the care and treatment of their poor and friendless sick, but in a sum less than the actual cost to the institution for caring for them. One-half of the inmates have received the services of the physicians, as well as the nursing and their board, free of any charge to them. While a charge is made against every patient, other than the ones who are consigned there by the county or cities, it does not appear that anyone has ever been turned away, or excluded from its benefits, because of poverty, or inability to pay for the benefits. Private patients are received, who pay the institution for their rooms, boarding, and nursing, and pay their physicians for their treatment, but the funds received from this source are all devoted to the general expenses of the hospital. A building and grounds and furniture are not adequate to maintain a hospital. The nurses must be paid, fuel and lights, water and food provided, and some one to superintend and direct the operations of the hospital.

The fact that the institution receives a revenue from the recipients of its bounty, sufficient to keep it in operation, does not take from it its character as a purely public charity, where it was founded and endowed as such, and when all of the receipts go to providing for the purposes for which it was erected and maintained. The municipalities and the county itself in which the institution is located, and whose duty it is to care for the indigent sick of each of them, respectively, have, by its use, been saved the burden of erecting an institution of the kind of their own, or otherwise caring for such sick.

In 6 Cyc., 900, a public charity is defined "to be a gift, to be applied consistently with the existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from dis-

ease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.''

The Speers Hospital has been so conducted and was so endowed and maintained, that no private gain has come to any one, and all of its benefits go to the public.

The cases of Wathen v. City of Louisville, 27 R., 635, and Gray Street Infirmary v. City of Louisville, 23 R., 1274, relied upon to show that Speers Hospital is not a purely public charity, are not in point, since each of those institutions was founded and conducted with a view to private gain and resulted in private gain to the managers.

It is, therefore, adjudged that the judgment appealed from be affirmed.