SCOTT et al. v. ALL SAINTS HOSPITAL.
(No. 8829.)

(Court of Civil Appeals of Texas. Ft. Worth. March 30, 1918. Rehearing Denied April 27, 1918.)

1. TAXATION ⊙═▷241(2) — EXEMPTIONS—STATUTE—"PURELY PUBLIC CHARITY."

A hospital organized by some members of a church parish, having the general purpose to provide for and nurse sick and destitute persons, to which all persons in need of treatment were freely admitted whether they could pay or not, though such as were able to pay were expected to do so, as the hospital had no source of revenue other than such fees and donations to it, was a "purely public charity" whose land and buildings were exempt from taxation under Vernon's Sayles' Ann. Civ. St. 1914, art. 7507. § 6, and Const. art. 8, § 2.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Purely Public Charity.]

2. TAXATION ⊙═▷251—CHARITIES—PURPOSE OF CHARGE—SUFFICIENCY OF EVIDENCE.

In suit by a charitable hospital against the tax collector and other officers of the county to restrain them from enforcing the collection of taxes, evidence held not to show that the charge made by the hospital against patients financially able to pay was made with a view to profit, but rather that it was made to carry out the dominant purpose and general beneficent design of the founders of the hospital.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by the All Saints Hospital against Marvin Scott and others, officers of Tarrant County. From judgment for plaintiff, defendants appeal. Affirmed.

McLean, Scott & McLean and W. P. Walker, all of Ft. Worth, for appellants. Capps, Cantey, Hanger & Short, of Ft. Worth, for appellee.

BUCK, J. [1, 2] This is an injunction suit against the tax collector and other named officers of Tarrant county to restrain them from enforcing the collection of the taxes assessed against the real estate and personal property of All Saints Hospital, alleged to be an institution of "purely public charity," and therefore exempt from taxation under the statutes and the Constitution of the state. Plaintiff having abandoned its prayer for injunctive relief as against the collection of the taxes on its personal property, and having offered to pay the same, and the court having entered judgment against it as to the taxes on its personal property for the years 1915 and 1916, and having granted the injunction only as to the taxes on the real estate and the improvements thereon for said years, the one question presented by this appeal is: Do the facts show this appellee to be such an institution as under section 6, art. 7507, Vernon's Sayles' Tex. Civ. Stats., is exempt from taxation, and as further authorized under section 2, art. 8, of the Constitution of Texas? Article 7507, § 6, reads as follows:

"All buildings belonging to institutions of purely public charity, together with the lands belonging to and occupied by such institutions not leased or otherwise used with a view to profits, unless such rents and profits and all moneys and credits are appropriated by such institutions solely to sustain such institutions and for the benefit of the sick and disabled members and their families and the burial of the same, or for the maintenance of persons when unable to provide for themselves, whether such persons are members of such institutions or not. An institution of purely public charity under this act is one which dispenses its aid to its members and others in sickness or distress, or at death, without regard to poverty or riches of the recipient, also when the funds, property and assets of such institutions are placed and bound by its laws to relieve, aid and administer in any way to the relief of its members when in want, sickness and distress, and provides homes for its helpless and dependent members and to educate and maintain the orphans of its deceased members or other persons."

Without undertaking to set out any considerable portion of the testimony in the exact words of the witnesses, we think the evidence adduced establishes the following state of facts: The institution had its origin in the minds and hearts of some 15 charitably inclined ladies, members of Trinity parish, Ft. Worth, Tex. They felt the need in the city of a hospital where the sick among the poor could receive careful nursing and skilled medical treatment, such as would not be available to such indigent persons in an institution run for profit. These ladies as-

sessed themselves 50 cents a month, and augmented this sum by going among the citizenship of the city and receiving small contributions. Finally they bought a piece of property, 100x100, on Magnolia avenue, for $400, to pay which purchase price took several years. In 1900 a charter was secured, and the first building was started. The brick masons working on it donated a part of their time, and from the Thurber Brick Company the ladies secured a donation of brick; the hauling and the freight thereon being paid for by the recipients. The outside walls were finally erected, and thus the building stood for years, awaiting the response to the charitably inclined for funds necessary to complete the building. Then the first floor was finished, and the first inmate, a charity patient, was installed. Subscriptions and donations came, not only from the citizenship of Ft. Worth, but from other portions of the state, and the buildings were completed and equipped. One wealthy and charitable donor fitted up an operating room. No one connected with the management receives any revenue or profit from the conduct of the institution, except the matron, nurses, and other paid employés. The charter states the purposes for which the corporation was organized in the following language:

"The purpose for which this corporation is the erection and maintenance of a charity hospital for the care of the poor and destitute, sick, and afflicted. Its general purpose shall be to provide for and nurse sick and destitute persons, and such patients as may choose to apply for admission under the rules and by-laws to be adopted by the trustees. Its plan of organization shall be to organize a hospital for the purposes aforesaid, as the best interests of society may require, and to provide therefor such management as may be necessary to carry out its general purposes as a church charity, provided always that such religious instruction and public worship as the trustees may prescribe therefor shall conform to the doctrine of the Protestant Episcopal Church in the United States."

The by-laws provide that the attending physician and surgeon on duty shall have charge of the charity patients, and shall visit the hospital daily, and oftener if necessary. As to admission of patients it further provides that:

"Pay patients, or boarders, shall be admitted to the hospital on rates to be established by the officers and upon agreement with them, upon the application of any medical practitioner or any school of medicine and of reputable character, upon the approval of such application by any members of the medical board or any of their appointees, or by a majority of the board of trustees, subject always to the capacity of the hospital and to the provisions of the by-laws.

"Charity patients shall be admitted to the hospital only to the capacity of the hospital and association to care for same. Furthermore, provided that charity patients shall be admitted without reference to the religious sect or denomination to which they may belong."

Therein it further provides:

"The board of pay patients per week shall be fixed by the officers, and it shall be the duty of the superintendent to collect from patients one week's board each week in advance, and pay the same to the treasurer, excepting only in cases of charity patients."

Mrs. Bevans, president of the board of trustees, testified in part as follows:

"The money which was required to complete the building was raised through subscriptions and by having teas and giving balls and tag days and by taxing ourselves so much, probably $25 a year. We were all poor, and did not have much goods. * * * Not a nickel that was put into this proposition was expended with the idea of receiving any return on it. There has never been any stock issued, and such a thing as stock certificates has never entered our minds. * * * The hospital is equipped for all character of surgical work, and it has rooms for the patients and operating rooms; there is an operating room donated by Capt. Burnett, which is said to be as fine as there is in the Southwest. There are 31 rooms in the hospital. There are a corps of nurses connected with the hospital; we have nurses in training, who also have to be paid. The hospital also provides medicine and other things necessary for the treatment of the sick, for which the hospital has to pay. The only way the hospital has of securing any revenue to enable it to do any charity work at all is by fees paid by persons who are able to pay for services which they receive there. The hospital has not a cent of permanent endowment, depending entirely upon fees, charges, or voluntary contributions which it may get.

"In the operation of the hospital we take all poor, indigent, and helpless patients that we possibly can, and give them every attention, just the same attention as if they paid $45 a week for a room, which is our best room; there is no distinction whatever. If a person is injured or sick in such way as that he could be admitted to any hospital, such a person is not rejected under any circumstances; he is always accepted; we make room for him some way. If it is a real case that has to come, our superintendent has been wonderful in making room for such cases; we have always taken nearly every one that has tried to get in. If a person is brought to the hospital who is able to pay for the services rendered to him, the pay will be accepted; if they do not pay, we just have to do without it; we do not force any one. There is no distinction made in the manner of treatment between those who pay and those who do not pay.

"With the exception of the people who work in the hospital, there is no one who draws any money from the institution, except this last month our secretary has had a great deal of expense; we gave her $20, to buy stamps and such things, and that is the first she has ever received. There is not a cent in any shape or form that goes to the trustees or any one like that in the way of remuneration.

"Of course, the hospital really does not pay its expenses, but if it did, and there was anything left, it would be used to pay off the mortgage. After the mortgage is paid up, anything that is taken in by the hospital over and above its expenses will be used to enable us to do more charity; we would enlarge the place so as to be able to do more of that kind of work; that is our intention and our ambition; I don't know that it will be fulfilled, but that is what we are looking forward to. * * *

"We have rooms in the hospital at different prices, ranging from $15 to $45 per week, and wards ranging from $6 to 10 per week. These prices are paid by patients in the hospital who are able to pay them. We have one room and three beds that are set aside and devoted exclusively to charity patients, but we also devote

other rooms to charity patients, when there is occasion to do so. All of the other rooms in the hospital except this one room I speak of are subject to be rented to pay patients when they are not already occupied.

"If a patient comes to the hospital and wants to be treated and is received into the hospital, he is expected to pay, if he can. We sometimes make inquiry beforehand as to their ability to pay, but when a man is very sick, you cannot make an inquiry. The patients are usually brought there by some doctor, but others make application in person. * * *

"It is not a fact that every patient is expected to pay who does not come as charity patient and represent that he is not able to pay. If you come out there to the hospital and we know your circumstances and know that you are able to pay, we would expect you to pay. Not all the time would we expect a person to pay who just came there and got a room, without stating at the time that they were unable to pay and would be a charity patient; in most cases such patient would be expected to pay; otherwise we could not run the hospital at all; we could not run the hospital a day or an hour, if it was just purely a charity hospital."

Mrs. D. I. Brown, superintendent, testified in part as follows:

"All Saints Hospital is a public charity in this way, that regardless of who it is, or what their condition 'is, except, of course, we do not take contagious diseases, such as smallpox or scarlet fever, they would be admitted. We have no contagious ward, and a patient with a contagious disease would not be admitted; otherwise there is no patient turned away; they are all admitted, and they are cared for in the same way as pay patients. Many times patients come in and do not specify their circumstances as they really should, either through pride or whatever it is; they state that they are expecting to get the money from home or from somewhere else, or they are going to sell some property or in some other manner secure the money to pay, but when they leave they may have quite a bill which they are not able to pay, and we have that obligation to carry. Sometimes a patient comes in and cannot pay the full amount that he would ordinarily pay or that would ordinarily be charged for the services he receives, and in that case he pays what he can and we accept that amount. At other times a patient will come in purely on the foundation of charity and such patients make no payments whatever. We take all the patients who are pay patients that apply for admission to the hospital, regardless of what doctor sends them there; and the same is true of patients who cannot pay; we take all of them, regardless of what doctor sends them there, and sometimes, you know, they just come there sick and want admission. I have never known a patient being refused admission who was indigent and helpless; there has never been one refused admission since I have been there, and when they are admitted, they get the same treatment as the other patients on that floor. They are attended to by a nurse just the same as any other patient on the floor. If they are in condition so that they can be left alone, they simply ring the bell if they want anything, and a nurse goes to them; if they are not in condition to be left alone, a nurse is furnished to stay right there with them."

We think enough evidence has been quoted to sustain the conclusion reached by the trial court that All Saints Hospital comes within the provision of the exemption statute cited. A charity is defined in Paschal v. Acklin, 27 Tex. 174, 199, to be:

"'A gift to a general public use,' which extends, or doubtless may do so, either to the rich or the poor."

5 R. C. L. p. 293, says:

"A gift is a 'public' charity when there is a benefit to be conferred on the public at large, or some portion thereof, as upon an indefinite class of persons. Even if its benefits are confined to specific classes, as decrepit seamen, laborers, farmers, etc., of a particular town, it is well settled that it is a public charity. The essential elements of a public charity are that it is not confined to privileged individuals, but is open to the indefinite public. Without undertaking to be technically accurate, a 'purely public' charity may be defined as one which discharges, in whole or in part, a duty which the commonwealth owes to its indigent and helpless citizens. Undoubtedly it is the duty of the state to educate its children, and thus fit them for discharging the duties of citizenship, to care for the indigent insane, its helpless orphans, and its poor who are sick and afflicted; and therefore any institution which, serving no selfish intent, discharges, in whole or in part, any such duty, is a purely public charity."

See 11 C. J. § 1, p. 299; 5 Am. & Eng. Enc. of Law (2d Ed.) p. 895; Gerke v. Purcell, 25 Ohio St. 229, 243; Dayton v. Speers Hospital, 165 Ky. 56, 176 S. W. 361, L. R. A. 1917B, 779, Ann. Cas. 1917B, 275.

A "purely public charity" is a charity "free from mixture of combination; * * * the charity must be unalloyed with other purposes and objects." Watterson v. Halliday, 77 Ohio St. 150, 82 N. E. 962, 968, 11 Ann. Cas. 1096.

In Widows' & Orphans' Home v. Commonwealth, 126 Ky. 386, 103 S. W. 354, 31 Ky. Law Rep. 775, 16 L. R. A. (N. S.) 829, cited with approval in Green's Adm'rs v. Trust Co., 134 Ky. 311, 120 S. W. 283, 20 Ann. Cas. 861, it is said:

"The [constitutional] convention meant by the word 'purely' to describe the quality of the charity, rather than the means by which it is administered, that it should be wholly altruistic in the end to be attained, and that no private or selfish interest should be fostered under the guise of charity, but it was never meant that, because a charity was limited by its terms to objects belonging to a certain sect, or fraternal order, or color, or class, it was a private, and not a public, charity."

Other decisions interpret the word "purely" as intensifying or limiting the word "public" rather than the word "charity." Philadelphia v. Masonic Home, 160 Pa. 572, 28 Atl. 954, 23 L. R. A. 545, 40 Am. St. Rep. 736; Newport v. Masonic Temple, 108 Ky. 333, 56 S. W. 405, 49 L. R. A. 252. But, take either construction or interpretation, we think this institution as operated is a "purely public charity." It is open to the public, to the limit of its capacity, without reference to creed, occupation, or denominational affiliation. In the Ohio case of Gerke v. Purcell, supra, it is said:

"When the charity is public, the exclusion of all idea of private gain or profit is equivalent, in effect, to the force of [the word] 'purely' as applied to public charity in the Constitution."

Since the Texas Legislature adopted our statute from the law of Ohio, it must be presumed to have adopted the construction theretofore placed upon such law by the

courts of last resort of that state. Morris v. Royal Arch Masons, 68 Tex. 698–704, 5 S. W. 519; Tyler v. St. L. S. W. Ry. Co., 99 Tex. 491, 91 S. W. 1, 13 Ann. Cas. 911; Collier v. Smith, 169 S. W. 1108. While in the case of Gerke v. Purcell the Ohio Supreme Court held that a parsonage did not come within the exemption because used as a private residence, and not as a place of public worship, yet it did hold the school buildings were exempt, although it was shown that contributions were expected from parents of the children who were able to contribute; the court finding that the schools were not established or carried on with a view to profit. To a like effect are the cases of Fordham v. Thompson, 144 Ill. App. 342, 347; Hospital v. Cook County, 233 Ill. 246, 84 N. E. 215, 216; Cook County v. Chicago Policlinic, 233 Ill. 268, 84 N. E. 220; Sisters of St. Francis v. Peoria County, 231 Ill. 317, 83 N. E. 272; Thornton v. Franklin Square House, 200 Mass. 465, 86 N. E. 909, 22 L. R. A. (N. S.) 486; and many other cases which might be cited. Our Supreme Court, in Red v. Morris, 72 Tex. 554, 10 S. W. 681, cited by both parties, held that school property was exempt from taxation when the owners use it solely for the purpose of keeping a school in it, and receive no profit from it. In this case it was shown that three of the owners lived in the building during term time, and two of them during vacation, but that their presence was necessary in the conduct of the school and to take care of the property. In the earlier case of Red v. Johnson, 53 Tex. 284, the court held that the same property was not exempt, because it was then shown that the owner lived on the premises occupying a part of the building as a residence, and held that the property was not shown to be used "exclusively for school purposes," as provided by the statute. In the case of Morris v. Royal Arch Masons, 68 Tex. 698, 5 S. W. 519, the Supreme Court held that the use for rental purposes of two floors of a three-story lodge building remove the entire property from the protecting ægis of the exemption statute, even though the proceeds from the rent of the two floors were used for charitable purposes. In the Morris Case the court cited with approval the Ohio case of Cincinnati College v. State, 19 Ohio, 110, in which it was held that a store, and the house in which it was kept, operated for profit by the college, was not exempt on the ground of use for school purposes exclusively. The Ohio court says:

"But when any society, no matter of what kind, * * * enters the common business of life, and uses of property for the purpose of accumulating money, the government should, and we think the statute does, treat it in the same way persons are dealt with, who are using property in a similar manner and engaged in the same business. Government cannot discrim-

inate between the uses which different societies or individuals will make of the proceeds of their business, and determine that this society or individual will make a more worthy disposition of the proceeds of his business than that, and therefore the one shall be taxed and the other not."

But the Morris Case was decided before the amendment of the section of the statute under consideration, by which the Legislature attempted to define what was an institution of "purely public charity." It is possible that legislative action was induced by reason of the holding in this case. By the announced purpose contained in the charter of All Saints Hospital "its general purpose shall be to provide for and nurse sick and destitute persons," etc. We think that purpose is included in the definition found in section 6 of article 7507, namely, that:

"Its funds, property and assets * * * are placed and bound by its laws to relieve, aid and administer in any way to the relief of its members when in want, sickness and distress."

Further, we are of the opinion that the charge made to patients who are financially able to pay the same is shown not to be made "with a view to profit," in the words of our statute, but for the purpose of carrying out the dominant purpose and general beneficent design of the founders of the institution. Such funds as are collected from patients do not go to any stockholders, for there are none, nor to accumulate in the coffers of the institution, but are used for the maintenance of the hospital and the furtherance of the announced purpose of its foundation. Hence we conclude that the judgment of the trial court should be affirmed; and it is so ordered.

Affirmed.