## CITY OF SAN ANTONIO et al. v. SANTA ROSA INFIRMARY et al. (No. 6861.)*

(Court of Civil Appeals of Texas. San Antonio. Jan. 24, 1923. Rehearing Denied March 21, 1923.)

1. Constitutional law ⬅➡14—If language is plain, it must be given ordinary meaning.

If the language of the Constitution in limiting the legislative authority with respect to exemptions from taxation is plain, the words used therein must be understood to have been used in their natural ordinary sense so that only the language can be considered.

2. Taxation ⬅➡204(2)—Doubt as to construction of exemption provision resolved against exemption.

If the meaning of Const. art. 8, § 2, authorizing an exemption, is doubtful, the facts must be resolved against the exemption.

3. Taxation ⬅➡241(1) — Property exempted must be purely charitable.

Within Const. art. 8, § 2, permitting the Legislature to exempt from taxation institutions of purely public charity, the word "purely" is intended to modify "charity" and not "public" so as to require the institution to have a wholly altruistic quality and exclude from it every private or selfish interest, or profit, or corporate gain or profit.

4. Taxation ⬅➡241(1)—"Purely public charity" defined.

A "purely public charity" which the Legislature is authorized to exempt from taxation is a charity which is indiscriminately dispensed to some portion or group of the public without profit or gain to the donor, and two outstanding qualities are essential: First, that the ends accomplished are wholly benevolent and are accomplished without profit or gain to itself through absolute gratuity; and, second, that the beneficiaries must be saved from becoming burdens upon society and the state.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Purely Public Charity.]

5. Taxation ⬅➡241(2)—Hospital founded and supported solely from profits from pay patients is not exempt as a "purely public charity."

A hospital which received no gift for its foundation but purchased its property from another corporation and assumed a legal obligation to pay therefor, and which paid all of its operating expenses from funds received from patients who were able to pay for their care, and were charged ordinary hospital rates, and which hospital, in addition, earned a profit to apply on the purchase price of the property, and on additions and improvements, is not a purely public charity which can be exempted from taxation, under Const. art. 8, § 2.

6. Taxation ⬅➡241(2)—That hospital earning a profit treated some patients free does not entitle it to exemption.

The fact that a hospital, which paid its operating expenses and realized a profit from patients who were able to and did pay for their care, devoted a small portion of its activities to the care of patients unable to pay therefor, does not make it a charitable institution entitled to exemption from taxation.

7. Taxation ⬅➡241(2) — Primary purpose of hospital to heal the sick is not controlling on right to exemption.

That the primary purpose of establishing a hospital was to heal the sick is not controlling in determining its right to exemption from tax-

⬅➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted April 11, 1923.

ation if in fact it makes a profit from the charges paid by its patients, otherwise all privately owned hospitals open to the public in general would be entitled to exemption.

**8. Taxation ⊕241(2) — Charitable hospitals are exempted because they care for those who would otherwise be public burdens.**

The theory upon which charitable hospitals are exempt from taxation is that their chief object and accomplishment is to care for those who would otherwise become charges upon the state or society, so that the care of patients who are able to and do pay therefor is not charitable.

**9. Taxation ⊕241(2)—Charity does not lose right to exemption by charging for some services rendered.**

A hospital recognized as purely charitable does not lose its identity as such, so as to defeat its right to exemption from taxation, because it makes a charge against those recipients of the services who are able to pay when the revenues derived from them supplemented by continuing donations from the charitably inclined are devoted exclusively to the maintenance and preservation of the foundation for the original purposes.

**10. Taxation ⊕241(2)—Rendition of services by members without pay held not to make hospital a charity.**

The fact that the members of a hospital corporation rendered services to the corporation during their membership, which depended upon the will of the Mother Superior of another organization, without compensation except their living expenses, and that the hospital assumed the obligation to care for them in sickness and old age, does not show that the hospital, which realized a profit from the services so rendered by its members, was a pure charity.

**11. Taxation ⊕241(2)—Investment by hospital of profits in improvements does not entitle it to exemption.**

Where a hospital earned a profit from its operations, the fact that such profits were invested by it in improvements to its buildings and equipment does not make it a purely public charity.

**12. Taxation ⊕241(2)—Disposition of profits not required does not give exemption.**

Where the charter of a corporation conducting a hospital gave the public no control or regulation of the hospital, nor an absolute right to its benefits, but authorized it to sell its property at any time, or to dissolve upon any lawful terms its members, who were selected by a stranger, might choose, so that it was possible for them to divert the property to wholly private purposes, the disposition of the profits realized from operating the hospital which actually was made by the members cannot give it an exemption from taxation.

**13. Taxation ⊕196—Statute not within constitutional grant of authority to exempt is void.**

If Rev. St. art. 7507, subd. 6, which seeks to put into effect the permission granted by Const. art. 8, § 2, to exempt from taxation an institution of purely public charity, goes beyond the authority granted or broadens the exemption so as to embrace institutions or property not contemplated by the framers of the Constitution, the statute is to that extent void.

### On Motion for Rehearing.

**14. Appeal and error ⊕1175(6)—Facts held to authorize rendition of judgment instead of remand.**

Where plaintiffs alleged the amount of taxes due and the answer admitted the assessment and levy were regular and the amount alleged correct, but denied liability in toto under a claimed exemption, and, upon the trial, defendants agreed that the assessment was regularly made, and on motion for rehearing on appeal assigned error in remanding the case because the amount of the taxes was admitted in the trial court under oath, the appellate court, on reversing a judgment for defendants, need not remand the case to have the amount of the taxes ascertained, but can render judgment for plaintiff for the amount alleged in the petition.

### On Second Motion for Rehearing.

**15. Appeal and error ⊕767(2)—Decision is that of court and not of member writing opinion.**

Though the individual member of the Court of Civil Appeals who writes the opinion in any given case is responsible for the language in which the decision is formulated, the decision of the questions disposed of is that of the whole court, unless the contrary is affirmatively shown, and represents the unanimous concurrence of the judges, so that an attack upon the opinion is an attack upon the court, and not upon the member thereof who wrote the opinion.

**16. Appeal and error ⊕767(2)—Averments and criticisms must be respectful.**

The Court of Civil Appeals invites the vigorous argument and forceful criticism of members of the bar so long as the arguments and criticisms are respectful in language and intent, but it will require that much.

**17. Appeal and error ⊕832(1) — Testimony in record held to sustain statements of fact made in opinion.**

Testimony in the record as to the operation of a hospital which claimed an exemption from taxation as a purely public charity *held* to sustain statements in the original opinion of the Court of Civil Appeals that a part of the hospital building was used as a drug store, that it conducted a practical training course for nurses, that it housed a clinic, and that 87½ per cent. of its patients were pay patients, notwithstanding the assertion of the second motion for rehearing that such statements were absolutely unsupported by testimony.

Appeal from District Court, Bexar County; Robt. W. B. Terrell, Judge.

Suit by the City of San Antonio and another against the Santa Rosa Infirmary and another to recover taxes. Judgment for de-

---

⊕For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

fendants, and plaintiffs appeal. Reversed, and judgment rendered for plaintiffs.

T. H. Ridgeway, William J. Park, R. L. Marshall, and Herbert Oliver, all of San Antonio, for appellants.

Don A. Bliss and John C. Sullivan, both of San Antonio, for appellees.

SMITH, J. The city of San Antonio and the San Antonio independent school district brought this action against the Santa Rosa Infirmary and the congregation of the Sisters of Charity of the Incarnate Word, corporations, to recover taxes assessed by the city and school district for the fiscal year from June 1, 1918, to May 31, 1919, against certain real property and improvements thereon, on which the defendant corporations operated what is known as the Santa Rosa Infirmary. The defendant corporations sought to defeat the tax upon the ground that the property was exempt from taxation under the provisions of section 2, art. 8, of the Constitution of the state, and of subdivision 6 of article 7507 of the Statutes, and this is the only question presented below and in this appeal. The cause was tried by the court without a jury and judgment was rendered against the city and school district. It is necessary to make a full statement of the facts in order to determine the question presented.

The Santa Rosa Infirmary is a corporation, organized in 1918 under the laws of Texas. Its charter contains the following, among other provisions not material here:

"The purposes of this corporation shall be both benevolent and charitable, and especially for the acquisition of, or the erection of and the maintenance of a hospital in the city of San Antonio, Bexar county, Tex., at which the members of this corporation will administer to the sick, the infirm, the helpless, the maimed and the afflicted of all creeds, colors and nationalities, to enable its members to receive and properly to care for all such as may be brought to, or present themselves at, the infirmary of this corporation, for such treatment, nursing and care—especially excluding and excepting, however, such person or persons as may be suffering from any mental or contagious disease—and to alleviate the ills, sufferings, pains and afflictions of all such as are included, as before mentioned, and to restore them, as far as possible, to the best condition of health.
* * *

"The term for which this corporation is to exist is fifty years.

"This corporation shall have no capital stock, but it shall have the right and the power to acquire and to hold property of all kinds, whether real, personal or otherwise, necessary requisite and appropriate for the carrying out of and the proper fulfillment of all the objects and purposes of this corporation, as in the judgment of its directors, and their successors, may be deemed expedient or best; together with the right and the power to dispose of same, or any part thereof, when in the judgment of its directors, or their successors, it may be deemed advisable or expedient and proper so to do.

"This corporation now owns no property, real or personal, but the estimated value of the goods and chattels, rights and credits, held in trust for it and which it intends to acquire, is, approximately, twenty-five thousand dollars.

"The members of this corporation are and shall only be chosen from the members of the Religious Order of Catholic Sisters of Charity known as the Sisters of Charity of the Incarnate Word, of San Antonio, Texas.

"Should any member of this corporation cease to be a member of the said Order of the Sisters of Charity of the Incarnate Word, such shall, ipso facto, terminate her rights in, and membership in this corporation, and shall operate to forfeit all claim she may or might have by reason of her membership herein.

"Removal by death, or by action of the superiors of the said Order of the Sisters of Charity of the Incarnate Word shall likewise operate to terminate such membership and all and every right acquired hereby or hereunder, or by reason of the fact of such membership.

"The interest of a member of this corporation shall be nonassignable and shall not pass to any other person, or to any other member of this corporation, whether by devise, or bequest, by voluntary or involuntary conveyance."

The infirmary corporation is dominated and controlled by the Sisters of the Incarnate Word, also a corporation, which designates from its own membership the 50 members for the time being constituting the infirmary corporation. These members are selected by the Superioress General of the Incarnate Word Corporation, and assigned to duty with the infirmary, by which they automatically become members of the infirmary corporation. They may be removed and substituted at any time by the same authority, out of which arises the complete control of the parent corporation over its subsidiary. As will be seen from the provisions of its charter, the infirmary corporation has the unrestricted power to acquire, hold, and dispose of all and every character of property, in the discretion of its directors.

The Santa Rosa Corporation purchased the infirmary here in controversy from the Incarnate Word Corporation. The infirmary property consists of about a block of land and the buildings thereon. The Santa Rosa Corporation paid no cash for the property, but gave instead its vendor's lien note for $125,000 the price agreed upon, barring interest, and payable on or before 20 years from its date. So far as the record shows, the corporation owns no other property. It purchased the infirmary during the fiscal year 1918, for which year alone taxes are here sought to be recovered.

The corporation uses its buildings for four specific but related purposes: First, for general hospital purposes; second, the operation of a drug store; third, the conduct of a training school for nurses; and, fourth, it houses what is known as "St. Luke's Clinic,"

which maintains office quarters and waiting room, and has the exclusive use of six beds, in the infirmary building. The testimony does not clearly, or even approximately, disclose the full purpose or nature or workings of the clinic or training school, or their relation to the corporation. It is apparent that the St. Luke's Clinic is a separate organization from that of the infirmary, to which it pays a rental of $500 a year, and it may be inferred that the training school is conducted exclusively by the corporation. As we view the case, however, the true facts relating to them become immaterial.

The operative force of the infirmary consisted in 1918 of the 50 members of the corporation, whose compensation includes only clothes, food, board, lodging, and incidental expenses, and about 30 salaried employees including instructors, nurses, pupils, orderlies, and male and female "helpers." These salaries amounted, in 1918, to $9,260.25. Graduate nurses employed in caring for patients are paid by the patients themselves, at the rate of $21 a week.

The infirmary, as may be said of all general hospitals or like institutions, does not discriminate against patients asking admission thereto, because of race or creed or nationality, nor does it draw any color line, according to the testimony of its officials. All are admitted and given whatever treatment or care their condition necessitates, without reference to creed, color, race or nationality, or disease, except that those suffering from mental or contagious diseases are excluded. It further appears from the testimony that those who are able to pay are charged the usual rates of such institutions for room and board, and are charged extra for operating and laboratory facilities, for medicines, surgical dressings, and supplies essential to their treatment. When they require special nurses, the patients pay the nurses direct, at the rate of $21 a week. But if patients presenting themselves are unable to pay they are nevertheless admitted and cared for without charge, and are given free of charge the same treatment and facilities enjoyed by the pay patients, except that as a rule the private rooms in the infirmary are reserved for pay patients, while the free patients are assigned to wards, or rooms equipped with two or more beds. At the time under inquiry there were 71 private rooms in the infirmary, for which patients were charged from $21 to $40 a week, 7 wards, for the use of the beds in which patients were charged from $12 to $15 each a week, and 4 operating rooms, for the use of which patients were charged from $5 to $15 for each operation, depending upon the length and nature of the operation. During the year in question, 4,471 patients were admitted into the infirmary for treatment, of which 3,482 paid the full charges, 436 paid one-half the charges, and 553 paid no charges; in other words, 87½ per cent. of the patients paid, and 12½ did not pay.

In addition to the 553 patients treated free of charge, the Sisters of Charity constituting the members of the corporation, engage in other charitable work, such as "to feed and clothe the needy and hungry, who present themselves, without charging therefor," and without seeking them out, "receive unfortunate girls and find homes for their offspring, and then procure suitable employment for the mother when the condition of her health permits." The funds for these additional charities are drawn from the general funds of the corporation, and charged as an expense. The "approximate aggregate of the total of these charities is between $12,000 and $15,000 a year." It further appears from the testimony that the infirmary cares for its members when ill, and when they grow old, and bury them when they die, and that these members are not compensated except that they receive board, clothes, and lodging from the infirmary while acting as members.

The corporation, after purchasing the infirmary upon its corporate obligation to pay for it, began operating it in a businesslike way. It maintains a drug store, from which it sells its wares to the doctors and patients at a profit, but supplies them to the free patients without charge. It provides space in its building for the use of St. Luke's Clinic, from which it collects a rental of $500 a year, although it was in evidence that this charge was nominal. It charges standard hospital rates for its private rooms, wards, operating rooms, laboratory facilities, medicines, surgical dressings, and supplies. From these sources alone it derives its income, since no part of its revenues comes from charitable or other donations or contributions. These sources yielded a gross income in 1918 of $117,767. In 1919 it received from the same sources $169,175, and in 1920, $204,296. After paying all its expenses, and dispensing every charity it practiced in those three years, after paying an assessment of $3,800 levied against it in 1918 by the Incarnate Word Corporation for the education and maintenance of members of the Incarnate Word Congregation, and an unknown amount for the same purpose in the other two years, and after applying about $30,000 upon the purchase price of the infirmary property in the three years (assuming that it pays approximately the same amount thereon each year)—after paying all expenses, including all its charities, and the assessments of the Incarnate Word, and $30,000 on the purchase price, its books still showed a balance on hand from 1918 of $23,462, of $20,927 in 1919, and of $33,831 in 1920. If the payment to the Incarnate Word Corporation, and upon the purchase price of the infirmary, was each year the same as in 1918, or $3,800 and $10,000, respectively, as we are warranted in

assuming, and these sums are added to the net profits, as the latter item, at least, should be, then these profits in 1918 amounted to $37,262, in 1919 to $34,729, and in 1920 to $47,631, or a total net profit of $119,620 in the three years. On the amount invested, $125,000, the net profits thus amounted in 1918 to nearly 30 per cent., in 1919 to nearly 28 per cent., and in 1920 to 38 per cent.. These profits have been placed in a building fund from which additional buildings and equipment costing $300,000 are being added to the assets of the corporation, the amount of which has been furnished by the Incarnate Word Corporation, to which the Santa Rosa Corporation has obligated itself to repay it. From the foregoing facts it will be readily seen that the corporation is an unusually prosperous one from a financial standpoint, yielding profits several times greater than those usually allowed public service corporations subject to governmental regulation, or earned by the securities upon which the financial business of the country is transacted.

It is provided in section 1, art. 8, of the Constitution of Texas that—

"Taxation shall be equal and uniform. All property in this state, whether owned by natural persons or corporations, other than municipal, shall be taxed in proportion to its value, which shall be ascertained as may be provided by law; * * * provided, that two hundred and fifty dollars worth of household and kitchen furniture, belonging to each family in this state, shall be exempt from taxation. * * *"

In 1906 section 2, of the same article, was amended by vote of the people, and as amended is as follows (the words included in the section by amendment are italicized by us:

"Sec. 2. All occupation taxes shall be equal and uniform upon the same class of subjects within the limits of the authority levying the tax; but the Legislature may, by general laws, exempt from taxation public property used for public purposes; actual places of religious worship; places of burial not held for private or corporate profit; all buildings used exclusively and owned by persons or associations of persons for school purposes and the necessary furniture of all schools; *also the endowment funds of such institutions of learning and religion not used with a view to profit; and when the same are invested in bonds or mortgages, or in land or other property which has been and shall hereafter be brought in by such institutions under foreclosure sales made to satisfy or protect such bonds or mortgages, that such land and property shall continue only for two years after the purchase of the same at such sale by such institutions and no longer,* and institutions of purely public charity; and all laws exempting property from taxation other than the property above mentioned shall be null and void."

The provision in the foregoing section giving authority to the Legislature to exempt the property of institutions of charity should be paraphrased so as to read—

"* * * But the Legislature may, by general laws, exempt from taxation * * * all buildings used exclusively and owned by * * * institutions of purely public charity." Morris v. Masons, 68 Tex. 698, 5 S. W. 519; City of Houston v. Benevolent Ass'n, 111 Tex. 191, 230 S. W. 978.

The statute in force in 1918, and now, by which it is sought to exercise the constitutional permission to exempt the property of charitable institutions (subdivision 6, art. 7507), is as follows:

"6. *Public Charities.*—All buildings belonging to institutions of purely public charity, together with the lands belonging to and occupied by such institutions not leased or otherwise used with a view to profits, unless such rents and profits and all moneys and credits are appropriated by such institutions solely to sustain such institutions and for the benefit of the sick and disabled members and their families and the burial of the same, or for the maintenance of persons when unable to provide for themselves, whether such persons are members of such institutions or not. An institution of purely public charity under this act is one which dispenses its aid to its members and others in sickness or distress, or at death, without regard to poverty or riches of the recipient, also when the funds, property and assets of such institutions are placed and bound by its laws to relieve, aid and administer in any way to the relief of its members when in want, sickness and distress, and provides homes for its helpless and dependent members and to educate and maintain the orphans of its deceased members or other persons."

[1, 2] It will be seen that the Constitution does not itself exempt from taxation any property except household and kitchen furniture up to the value of $250. And while the Legislature is given authority to exempt other property specifically designated in the Constitution, such authority to exempt is expressly restricted to such property so designated. If the language of the Constitution, in limiting the legislative authority in respect of the subject, and in specifying the property upon which that authority may fix the exemption, is plain, the words used therein must be understood to have been used in their natural, ordinary sense, so that in ascertaining the power and authority granted the Legislature the rule is to consider only the language of the Constitution granting or defining them. Stockton v. Montgomery, Dallam, Dig. 473. If the meaning of the words authorizing the exemption is doubtful, then the doubts arising therefrom must be resolved against the exemption, which, to become effectual, must be expressed in terms too plain to be mistaken. 23 R. C. L. 313; Morris v. Masons, supra.

The ideal system of taxation is that which is made to apply both uniformly and universally, and when the supreme power of the state in its wisdom excepts a class from the otherwise universal rule, it is the duty of the courts to strictly construe the exemption so

that it may be certainly confined to those within the contemplation of the granting power at the time of the grant. If the exemption be liberally construed, or extended by implication, then, to that extent, it puts a burden upon the many for the enrichment of a few, and the wholesome purpose of the granting power is subverted.

[3, 4] The utmost confusion exists among the decisions of the courts of the various states of the Union as to what constitutes an "institution of purely public charity." These definitions run through two distinct lines of decisions, one determining the liability of such institutions for acts of negligence of employers, and the other determining their liability for taxes under constitutional or statutory exemptions. The confusion exists among and between both lines. Consequently it is only by careful analysis that aid can be gotten from the authorities in other states, except as they seek to promulgate the most general principles underlying the charities of the world, and the exercise of the sovereign power to tax persons and property. There is a wide latitude exercised in the various definitions of the word "charity," even, but in the definition of the word "public," and the word "purely," as used in the phrase "purely public charity," there is the widest possible divergence of views. The courts even disagree as to whether the word "purely" modifies the word "public," or the word "charity," some holding that it modifies one, and some the other. In Texas it is held that "purely," as here used, is intended to modify "charity" (City of Houston v. Scottish Rite, 111 Tex. 191, 230 S. W. 978), and to give it a wholly altruistic quality, thus excluding from it every private or selfish interest, or private or corporate gain or profit. If permitted to exercise a license so universally appropriated by the courts of other states, we would hazard the opinion that by a "purely public charity" is meant a charity, which is indiscriminately dispensed to some portion or group of the public, without profit or gain to the donor; or, as was said by the Supreme Court of Texas in the Houston v. Scottish Rite Case, an institution may be said to be "one of 'purely public charity' where: First, it made no gain or profit; second, it accomplished ends wholly benevolent; and, third, it benefited persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the state." It will be seen from this definition that to give an institution the character of purely public charity two outstanding qualities are essential: First, that it must accomplish "ends wholly benevolent" without "profit or gain" to itself, and "through absolute gratuity"; and, second, that in dispensing this absolute gratuity, and accomplishing these wholly benevolent ends, without gain or profit to itself, it must thereby save the beneficiaries from becoming burdens upon society and the state. Upon this basis we will now consider the case as made.

[5] The Santa Rosa Corporation, without the aid of gift, devise, or bequest, and having no capital stock, purchased the infirmary property upon its own corporate obligation to pay for it in the future. It is operated and maintained upon revenues derived wholly from fixed charges against its patrons, and is paying the entire purchase price of the properties out of the revenues thus derived. Thus none of its assets, nor any part of the cost of operation or maintenance, is derived from gift, devise, bequest, or donation from any charitable or other source. All of its revenues, for every purpose, are derived from the profits arising out of the conduct of its business. To this extent and for these purposes the institution has no characteristic not common to every corporation organized and operated as a purely private business enterprise. It is this institution thus created, and conducting this business thus established, maintained and operated, which seeks exemption from taxation upon the ground that the whole constitutes "an institution of purely public charity," and that the property mentioned is used exclusively by such institution. In the consideration of this appeal we have endeavored to carefully examine all the authorities cited by both parties, and to which we have access, and scores of others not cited. We believe we are correct in saying that all the institutions held in those cases to be of purely public charity were founded upon bequests, devises, donations, contributions, or free will offerings from public funds, the public at large, or from individuals, groups, or societies, who freely gave without hope of returns or rewards except that satisfaction of heart and soul which comes alone from the doing of kindly deeds. Thus the foundations of such institutions were laid in pure charity to begin with; whereas, appellee corporation was founded and is maintained, not upon charitable donations, for it received none, but wholly upon the profits derived from its operation. Without hope of such profits, it could not have been established or acquired; without actually earning and collecting such profits, it could not be retained or sustained. It was conceived in and is nurtured solely upon profits derived alone from the operation of the very property it seeks to have exempted, as a purely public charity, from the burden of taxation resting upon all other businesses similarly founded and maintained. It is inconceivable that the framers of our Constitution had that character of business in mind when it authorized the Legislature to relieve institutions of purely public charity

from those burdens. In the case of Morris v. Masons, 68 Tex. 698, 5 S. W. 519, Judge Gaines, for the Supreme Court of Texas, quoted with approval the following from the Supreme Court of Ohio (Cincinnati College v. State, 19 Ohio, 110), from which state the constitutional provision now under consideration was borrowed:

"But when any society, no matter of what kind, * * * enters the common business of life and uses property for the purpose of accumulating money, the government should, and we think the statute does, treat it in the same way persons are dealt with, who are using property in a similar manner and engaged in the same business. Government can not discriminate between the uses which different societies or individuals will make of the proceeds of their business, and determine this society or individual will make a more worthy disposition of the proceeds of his business than that, and therefore the one shall be taxed and the other not. The Legislature could not, without a flagrant violation of the principles of equality on which our institutions are founded, make a distinction such as is contended for. * * *"

To which Judge Gaines adds this comment:

"It is but reasonable to presume that the law makers considered that property which was producing an income, could bear a tax, although they deemed it proper to exempt such as was used exclusively for public charity and at the same time yielded no revenue."

The Supreme Court of Georgia, in Massenburg v. Grand Lodge, 81 Ga. 212, 7 S. E. 636, very aptly states the true rule:

"It is no more allowable under the Constitution for a charitable association to accumulate money by the use of exempt property * * * than it is for a common citizen to do it. * * * The acquiring of money by the use of property or capital is not the appropriate office of a charitable agency, but rather to apply and administer that which has been accumulated through its own bounty or the bounty of others. It is not an instrumentality for gathering together, but for scattering abroad. When charity has a business side, let it conduct business, as the world generally, on business principles; the first rule of which is to provide for taxes, the highest claim on every species of property employed in the common avocations of life."

[6-8] It does not suffice to say that because it devotes a small portion of its activities to pure charity appellee's institution is so far removed from the general class as to bring it within the constitutional permission for exemption, thus enabling it to escape the burden of taxation borne by other institutions of the same general character. The fact remains that whatever its original or remote purposes were or are, its dominant accomplishment is the operation of a profitable business enterprise, to which its benevolences, while most commendable, are only incidental, and, we may well say, negligible,

in view of the magnitude of the whole project, and the handsome profits derived therefrom. The fact that the primary object of that business is to heal the sick and minister to the afflicted does not within itself control the case, for that is the object of all hospitals, of course, and the further fact remains that seven out of every eight of the beneficiaries are able to and do pay for the services rendered. In no event would these beneficiaries became charges upon society and the state, because all privately owned hospitals, with like facilities, are open to them upon the same terms and conditions imposed by appellees. The theory upon which charity hospitals are exempt is that their chief object and accomplishment is to care for those who would otherwise become charges upon the state or society; whereas, the dominant accomplishment of appellee is to minister to those who in no event would become such burdens, and from whom it derives a profit wholly inconsistent with the fundamental principles of charity, for charity operates without hope or expectation of gain, and is so inconsistent therewith that to accept it is to convert the charity into a mere business transaction. When this rule is applied to appellee and the business it is engaged in, it must take its position along with other institutions and concerns operated for profit, and share with them the burdens of the government under whose protection it flourishes with such financial success. It is no more an institution of "purely public charity" than is the average physician, whose life is devoted to healing the sick and ministering to the afflicted, or the person, firm, or corporation which by reason of large capital and business sagacity is so prosperous that it may and does dispense a generous charity.

[9] We do not intend by what we have said to hold that the fact that appellee makes a charge against those who are able to pay for their accommodations within itself deprives appellee of the exemption it claims. On the contrary, it may readily be conceded that an institution recognized as purely charitable does not lose its identity as such when it makes a charge against those recipients of the services who are able to pay, when the revenues derived therefrom supplemented and leavened with continuing donations from the charitably inclined, are devoted exclusively to the maintenance and preservation of the foundation for the original purposes.

[10] Nor have we for a moment lost sight of the fact that the members of the corporation devote their services to appellee's institution and receive no pay therefor beyond their actual personal necessities, and that the institution cares for them in sickness and senility, and gives them burial when they die. It is difficult to analyze the effect of this fact upon the issue involved. In

the first place, the tenure of office of the members of the corporation is of the most transient and uncertain nature, for those members, individually or collectively, have no sort of control of that tenure, which rests wholly within the discretion of the Superioress General of the Incarnate Word Congregation, another corporation, who may select and remove the members of the Santa Rosa Corporation without consulting them or their corporation. So, the obligation of the latter to care for its members after their usefulness to the corporation is ended is uncertain in its operation and effect, being dependent upon the exercise of the judgment, discretion, or caprice of an individual who is in legal contemplation a stranger to the institution. Be that as it may, however, the remaining fact is that the members of the corporation devote their energies to the infirmary, during the uncertain tenure of their membership, in return for which the corporation gives them only their clothes, food, lodging, and such other necessities as their simple lives require. This fact is stressed as one of the charities dispensed by appellee. We must lay aside sentiment in discussing and considering this cause, and when we do so, and apply cold reasoning to an analysis of the facts in this immediate connection, as we must, we do not perceive that appellee can take any credit for charity out of its relation to its current members. The charity comes rather from the members, as individuals, and flows directly from them to the patrons of the corporation, which reaps a large monetary reward for such services so unselfishly given, and hoards it in its coffers.

[11, 12] It is contended that the profits appellee is making out of the operation of the infirmary and its adjuncts are for the time being appropriated to the construction of additional buildings and equipment of the value of $300,000, by which the operation of the project will be enlarged to that extent, and that by this process the surplus thus accruing and appropriated loses its identity as profits, and serves merely to widen the capacity of the charity. The contention is unsound, in our opinion. The surplus in this case represented the net earning from the operation of the enterprise after every expense, including all and every charity dispensed, had been paid, and no future disposition of that surplus could deprive it of the quality of pure profits. When used in the building program, it merely adds that much to the assets of the corporation, and such appropriation cannot be made to relate back and destroy its identity as a pure profit. By this process the corporation is accumulating a vast estate, acquired wholly through profits earned in operating the property sought to be exempted. The institution is not subject to any control or regulation by public authorities, and the public has no enforceable right or interest therein. It is not founded or endowed so as to give the general public under reasonable restrictions, an absolute right to its benefits. It is not a trust estate to be administered under restrictions limiting its use to public or charitable purposes, or by which it may not at once or at any time pass into other hands for purely private purposes. It is not a corporation upon the dissolution of which its properties would rest in the public. It rests under no sort of restrictions as to its future or present disposition. It is not required under its charter provisions to dispense any charity in any form or for any purpose, and even if so its charter could be amended at any time and its uses devoted to any other lawful purpose. It may sell its property at any time to others who may use it for any lawful purpose, or it may dissolve at any time upon any lawful terms its members, selected by a stranger, may choose. The absence of any restrictions of the nature indicated is inconsistent with the character of a purely public charity, entitled to exemption from taxation as such. Fitterer, Trustee, v. Crawford, 157 Mo. 51, 57 S. W. 532, 50 L. R. A. 191; Delaware Inst. v. Delaware County, 94 Pa. 163; Donohugh's Appeal, 86 Pa. 306. For, otherwise, those operating the institution could, and in some cases would, sit in judgment upon what is a charity; could, and sometimes would, dispense it in accordance with their own caprices and notions; and, after acquiring a vast estate amassed under exemption from taxation, could, and sometimes would, dissolve the so-called charity and distribute its assets among themselves, or divert it to wholly private purposes, or sell it to others who would so divert it. As was said by the Supreme Court of Pennsylvania in the Delaware Interstate Case:

"No corporation or institution is a purely public charity, which is not under the control * * * of the public authorities; or, at least, subject to public visitation; or, is founded and endowed so as to give the general public, under reasonable restrictions, an absolute right to receive its benefits, and, in case of failure of its managers to carry out the founder's will, to compel compliance therewith by an application to the courts. In case of a dissolution of such a charity, its property must rest in the public authorities for charitable uses."

In other jurisdictions the conclusions we have undertaken to state are supported by the authorities. It is held that in order to earn exemption the charity must show that it is at least substantially maintained by public or private charity (Appeal of the City of Philadelphia [Pa.] 15 Atl. 683); that it is devoted exclusively to charity (Young Men's Protestant Temperance & Ben. Soc. v. Fall River, 160 Mass. 409, 36 N. E. 57), which is its

paramount purpose (New England Corporation v. Boston, 172 Mass. 60, 51 N. E. 456, 42 L. R. A. 281; Board of Review v. Hospital, 233 Ill. 242, 84 N. E. 216), and if it embarks in business for profit it ceases to be exempt (Academy v. Philadelphia, 150 Pa. 565, 25 Atl. 55); that if the number of pay patients preponderates it ceases to be a purely public charity, and becomes a business organization conducted for corporate gain, with incidental acts of benevolence and philanthropy (Sanitarium v. Inhabitants of Stoneham, 205 Mass. 335, 91 N. E. 385); that the charity must be unmixed with private or corporate gain (Donhugh's Appeal, 86 Pa. 306), and free from the elements of private or corporate gain (Philadelphia v. Women's Christian Ass'n, 125 Pa. 572, 17 Atl. 475; Episcopal Academy v. Philadelphia, 150 Pa. 565, 25 Atl. 55); that if it is not conducted solely for the benefit of the public it is not commensurate with the scope of the project, and therefore not exempt (Philadelphia v. Overseers, 170 Pa. 257, 32 Atl. 1033, 29 L. R. A. 600); that if the charges collected from pay patients are more than needed for its successful maintenance, the exemption fails (Sanitarium v. Battle Creek, 138 Mich. 676, 101 N. W. 855); that it must be shown that the charity is so endowed or held in trust that its charitable features cannot be abandoned (Thiel College v. Mercer County, 101 Pa. 530; Miller's Appeal, 10 Wkly. Notes Cas. [Pa.] 168; Hunter's Appeal, 22 Wkly. Notes Cas. [Pa.] 361; Appeal of City of Philadelphia [Pa.] 15 Atl. 683; Philadelphia v. Women's Christian Ass'n, 125 Pa. 572, 17 Atl. 475, and in case of dissolution must vest in public authorities for charitable purposes (Newport v. Masonic Temple Ass'n, 108 Ky. 333, 56 S. W. 405, 49 L. R. A. 252; Delaware Inst. v. Delaware County, 94 Pa. 163; Fitterer v. Crawford, 157 Mo. 51, 57 S. W. 532, 50 L. R. A. 191.)

Appellee's counsel have presented its case with such earnestness and ability that we feel obliged to discuss the authorities cited and relied upon by them. We do not regard these authorities as being so squarely in point, or adverse to our conclusions, as to seriously affect the great weight of the authorities leading us to those conclusions. In all the cases cited, as we understand them, the institutions held to be charitable were operated either without profit or upon a deficit. In none of them were the profits of such nature as to permit any accumulation of surplus. We will briefly notice each of those cases:

The first case cited (Dayton v. Speers Hospital, 165 Ky. 56, 176 S. W. 361, L. R. A. 1917B, 779, Ann. Cas. 1917B, 275), a Kentucky case, is not in point. The institution there involved was earning no profits, and, besides, it was shown to have been founded upon a bequest passing as a trust, under which it could not be diverted, and requiring it to be administered by trustees appointed by the county judge, and under the supervision of public authorities.

In Sanitarium v. Inhabitants of Stoneham, 205 Mass. 335, 91 N. E. 385, the decision is not in point. The institution was operated with a deficit, and hence without profit. It was held, too, that in order to earn exemption charity must be the dominant purpose of the institution claiming the exemption.

In Board of Review v. Hospital, 233 Ill. 242, 84 N. E. 216, the decision is not in point. It was based upon an exemption of institutions of "public charity" contained in an amendment of an old statute in which the exemption was of institutions of "purely public charity." It was there held, by the Supreme Court of Illinois, that under the latter statute the exemption probably could be made to apply only to institutions operated by public control, in accordance with the decision in Catholic Knights of Illinois v. Board of Review of Effingham County, 198 Ill. 441, 64 N. E. 1104. It also appears from the case cited by appellee that the institution there held to be a charity was founded upon a trust fund, devised to charitable purposes, which could not be lawfully diverted from those purposes, or, if diverted, would thereby revert. The foundation was maintained from charges made against pay patients, which, being insufficient to pay expenses, was supplemented by voluntary contributions.

The decision in Sisters v. Board, 231 Ill. 317, 83 N. E. 272, cited by appellee, is not in point for the same reasons given in the Hospital Case, last discussed. It was rendered under the amended statute from which the word "purely" had been omitted, as indicated.

The case of Denville v. St. Francis Sanitarium, 89 N. J. Law, 293, 98 Atl. 254, cited by appellee, is not in point because the facts in that case are not shown to be applicable here, nor are provisions under which the exemption was applied similar to that in this state.

The decision in Reynolds Hospital v. Marshall County Court, 78 W. Va. 685, 90 S. E. 238, is not in point, although the general principles announced are adverse to appellee's contentions here. In the first place, the exemption provision in the West Virginia Constitution is different from, and much broader than, ours. It was said by the Supreme Court of Appeals of West Virginia in the cited case that—

"The test which determies whether such an enterprise is charitable or otherwise is its purpose. * * * If it is to heal the sick and relieve the suffering, without hope or purpose of getting gain from its operation, it is charitable."

It was further held that the institution there involved was entitled to the exemption because "all the money derived" from the operation of the hospital "is applied toward its maintenance and support, and that there are annually large deficits caused by the necessary expenses being in excess of the receipts, which deficits are paid by voluntary contributions and that no profits are sought or received by the owners of the property."

In the case of Franklin House v. Boston, 188 Mass. 409, 74 N. E. 675, cited by appellee, the charity was organized under a statute providing for such charity, which was exempt under a statutory provision not set out, but from the decision apparently quite general in its application. None of the facts there are shown to be applicable here, but it appears that the foundation of the charity is so hedged about that it, nor any of the revenues derived therefrom, can be divided among the members or used or appropriated for other than the charities specified.

The case next cited by appellee is that of Sanitarium v. Battle Creek, 138 Mich. 676, 101 N. W. 855. The effect of the decision is adverse to appellee. There the foundation was originally a trust fund, afterwards incorporated, and could not be diverted to other than the charitable purpose for which it was appropriated. It was always operated with a deficit, and never earned profits. It was held there that—

"Such a corporation is sufficiently charitable to entitle it to the privileges of the act when the charges collected for services are not more than are needed for its successful maintenance."

The facts in State v. Board, 52 La. Ann. 223, 26 South. 872, cited by appellee, are not applicable here. The case affects several institutions claiming exemption. None of them were operated for or at a profit. Some were held exempt, while others were held to be not exempt. The former were so favored by the application of this rule, quoted from Philadelphia v. Women's Christian Ass'n, 125 Pa. 572, 17 Atl. 475:

"Notwithstanding its revenues are to some extent derived from payments for board and lodging by the young women for whose 'temporal, moral, and religious welfare' the association exists; such revenues not being intended as a source of profit, and being in fact insufficient to defray expenses, the annual deficit being made up by voluntary contributions."

The case of Philadelphia v. Hospital, 154 Pa. 9, 25 Atl. 1076, cited by appellee, involves a municipal claim of the city against the hospital for a water pipe supplying the insane ward of the institution. The facts of the operation of the institution are not shown, the case is not in point, and the decision in no wise conflicts with the decisions in the other Pennsylvania cases, one of which is to be discussed in the following paragraph.

The decision in Trustees of Episcopal Academy v. Taylor, Receiver of Taxes, 150 Pa. 565, 25 Atl. 55, is next cited by appellee. While the facts in that case are unlike the facts here, the general effect of the decision is directly against appellee, as will be seen from this extract from the opinion cited:

"An institution that is in its nature and purposes a purely public charity does not lose its character as such under the tax laws, if it receives a revenue from the recipients of its bounty sufficient to keep it in operation. It must not go beyond self-support. When a charity embarks in business for profit, it is liable to taxation like any other business establishment; but so long as the trustees of the school manage it as a charity, giving the benefit of what might otherwise be profit to the reduction of tuition fees, or the increase of the number of free scholars, in furtherance of the 'education of youth,' the purpose of their trust, their school house is entitled to exemption. It represents the gift of private persons and of the state. It is, as we said in Northampton Co. v. Lafayette College [18 Atl. 516], the educational plant; and so long as it is used to provide education at the mere cost of teaching alone, and is open to the public, it does not lose its character as a charity. A hospital erected and equipped by public or private charity might be conducted with such skill and economy as to become self-sustaining, but it would not thereby lose its character as a purely public charity. A private hospital, built and conducted as a business enterprise, stands upon widely different ground. There is no trust involved. no charitable use impressed, upon such an establishment. Nothing has been done or given by the proprietor in relief of the public, but he holds the title to his own property, and conducts the business for his own profit. If it proves unprofitable, he may close it up, or devote his plant to such other purposes as he will.

"In the case before us, the donors parted absolutely with what they gave. It was devoted to a charitable use, and the title placed in trustees. The trustees have invested it in a plant adapted to the purposes of the trust. By the use of this plant they are enabled to conduct a school that gives educational advantages to some free, and at a low cost to all, and thus make the charity pay the expenses of its own administration. The school is maintained by the use of its plant, the gift of both public and private charity, for the legitimate purposes of the trust, and in exact accordance with the will of the donors. It is therefore maintained by charity, within the meaning of the act of 1874."

The case next cited by appellee, Re Will of MacDowell, 217 N. Y. 454, 112 N. E. 177, L. R. A. 1916E, 1246, Ann. Cas. 1917E, 853, is not in point. It involves the construction of a will creating a charitable trust, in which it was held, in so far as applicable here, that the charitable character of the endowment is not destroyed because the recipients of the charity "are required to pay something for board toward the running expenses of the house," as stated in the syllabus.

The institution held exempt in the case of Thornton v. Franklin Square House, 200 Mass. 465, 86 N. E. 909, 22 L. R. A. (N. S.) 486, was a home established for working girls. It was founded by donations, and maintained by charges against the inmates based upon and equaling, but not exceeding, the actual cost of operating the institution. The nature of the foundation, and the method and purpose of operation, the one by donation and other without profit, readily distinguish that case from this.

Next is cited the case of Little v. Newburyport, 210 Mass. 414, 96 N. E. 1032, Ann. Cas. 1912D, 425. This case relates to a Y. M. C. A. organization. It, as the preceding case, is at once distinguishable from the instant case by the facts that it was founded upon donations, and was operated without profit and chiefly upon contributions, supplemented by small fees paid by the members.

The case of Hot Springs v. Sisters of Mercy, 84 Ark. 497, 106 S. W. 954, is cited by appellee. In many details the institution there involved is like the Santa Rosa Institution, and it is held by the Supreme Court of Arkansas to be exempt under the constitutional provision exempting "buildings and grounds and materials used exclusively for public charity," a broader exemption than that authorized by the Constitution of Texas. In that case, however, it was "not denied that the whole object of the institution is one of public charity," and the exemption was sought to be defeated upon the sole ground, it seems, that it received pay from some of the patients. The case was as a practical matter decided upon this point. The case is thus distinguishable from this one, and the difference is emphasized by this extract from the opinion, thus approving the conclusions we have here reached:

"In the case of County of Hennepin v. Brotherhood of Gethsemane, 27 Minn. 460, 8 N. W. 595, 38 Am. Rep. 298, the court said: 'A hospital, with the necessary grounds, free to all who are not pecuniarily able, and supported partly by private contributions and partly by fees from patients, but producing no profit, is a purely public charity.' In the case of Penn. Hospital v. Delaware Co., 169 Pa. 305, 32 Atl. 456, the court said: 'Property which is used directly for the purpose, and in the operation of the charity, is exempt, though it may also be used in a manner to yield some return and thereby reduce the expenses.' To the same effect, see Sisters of Charity v. Township of Chatham, 52 N. J. Law, 373, 20 Atl. 292, 9 L. R. A. 198; Mount Hermon Boys' School v. Gill, 145 Mass. 139, 13 N. E. 354; Episcopal Academy v. Philadelphia, 150 Pa. 574, 25 Atl. 55."

In the foregoing we have discussed all the out of state cases cited by appellee to support its contention that under the undisputed facts its institution is shown to be one of purely public charity for exemption purposes, except the following, which are not available to us: Gooch v. Ass'n, 109 Mass. 558; Gerke v. Purcell, 25 Ohio St. 229; State v. Powers, 10 Mo. App. 263. We have heretofore cited a sufficient number of Massachusetts and Missouri cases to show that the principles announced by the courts of those states are followed in this opinion. Appellee sets out nothing from the Ohio case except one extract from that opinion, which as will be seen lays down a rule which excludes appellee's institution, since it appears that the institution there under consideration "excluded all idea of private gain or profit," and was operated "without any view to profit." The extract follows:

"But when private property is appropriated to the support of education for the benefit of the public without any view to profit, it constitutes a charity which is purely public. When the charity is public, the exclusion of all idea of private gain or profit is equivalent, in effect, to the force of 'purely' as applied to public charity in the Constitution."

It appears, too, that in that case the charity was practically "supported out of the revenues of local churches and were not established or conducted with a view to profit," although "small contributions of 25 or 50 cents a month are expected from parents who are able to contribute."

We will now notice each of the five Texas cases relied upon by appellee. The first is Scott v. All Saints' Hospital, 203 S. W. 146, decided by the Court of Civil Appeals of the Second District. In that case the hospital was founded and built entirely upon donations and contributions from the public, and although some of its patients pay for the services rendered there, this source of revenue has never been sufficient to pay for the operation of the hospital, which has always had a deficit. The court in its opinion cites many of the decisions which we have herein cited, and quotes from them as we have done, particularly from the Cincinnati College Case, 19 Ohio, 110, approved by the Texas Supreme Court in Morris v. Masons, supra. In this way the principles we have applied here are approved in the All Saints Case, where the institution there involved, under the facts found, was held to be exempt, and that the fact that some of its patients were charged for services rendered them did not destroy the exemption in view of the fact that—

"Such funds as are collected from patients do not go to any stockholders, for there are none, nor to accumulate in the coffers of the institution, but are used for the maintenance of the hospital and the furtherance of the announced purpose of its foundation."

That case is readily distinguishable from this in that here the institution was not founded upon charity but upon profits derived from its operation, and from the same source earns an enormous profit, which is

"accumulating in the coffers of the" corporation.

The next Texas case cited by appellee is State v. Settegast, 227 S. W. 253, decided by the Court of Civil Appeals of the First District. The case is in no sense in point. In the first place the charity there involved was founded upon a bequest, and not upon profits from its operation, as appellee's institution was. It consisted of a large estate, bequeathed to charity, to be operated through trustees, and so restricted by conditions that it can never be lawfully diverted from the original purpose; whereas, appellee's property, acquired, not by gift but from profits derived from its operation, and fast growing through accumulating profits from the same source, is held under no restrictions whatever for any purpose. In the Settegast Case, the charity is not yet in operation, and for that reason, also, that case is not in point here.

The case of Houston v. Scottish Rite, supra, also cited by appellee, has already been discussed. In that case the Supreme Court did not decide that the charity there involved was such as to entitle it to exemption, such decision being unnecessary in disposing of the appeal.

Appellee also cites St. Paul's Sanitarium v. Williamson, 164 S. W. 36, decided by the Court of Civil Appeals of the Fifth District. The facts relating to the establishment and operation of the institution there in question are in most essentials like those here. The court held there that the trial court correctly charged the jury that the St. Paul Institution was "a charitable and benevolent" one, and was accordingly exempt from liability for the negligence of its agents. No authorities are cited in support of the first holding. It was not expressly held that that institution would come within the definition of "purely public charity." If it was not so held by implication, the decision is not in point here; if such holding may be implied, we do not feel bound by it in the face of the overwhelming weight of authority to the contrary.

And lastly appellee cites, with some reason, too, the case of Barnes v. Providence Sanitarium, 229 S. W. 588, decided by this court upon the question of liability for damages, and not for taxes. The fundamental facts in that case distinguish it from this in that the institution there held to be one of purely public charity was founded largely upon donations, and, although it received pay from a large per cent. of its patients, it had never made expenses, and hence earned no profits, but operated on a deficit. It is true that some of the language employed in the opinion in that case is apparently in conflict herewith, and that effect is given some of the facts there not given similar effect here. In so far as the decision in that case may be construed to be in conflict with this

decision, however, it is here expressly overruled, in view of the conclusions we have reached after a most exhaustive and painstaking investigation of the authorities upon the whole subject.

[13] We have felt no occasion to consider or discuss the question, raised by appellant, of the constitutionality of subdivision 6 of article 7507 of the Statutes, which seeks to put into effect the permission granted in section 2, art. 8, of the Constitution for the exemption in question. After all is said, the exemption must be tested by the language of the Constitution, its source. If the statute goes beyond the power granted, or by its terms broadens the exemption so as to embrace institutions or property not contemplated by the framers of the Constitution when authorizing the exemption, then to that extent the article is void, as expressly provided in the Constitution. While it is true that a casual consideration of the statutory provision raises grave apprehension in our minds that the Legislature, in its efforts to construe, define, and render effective the constitutional permission, so relaxed and amplified the exemption as to render it ineffectual for any purpose, we do not so hold. We do hold, however, that the Santa Rosa Infirmary Corporation and properties do not constitute an institution of purely public charity, as contemplated in the constitutional provisions for the reasons that (1) it was not founded wholly or in part upon any gift, devise or bequest, but solely upon profits derived and to be derived from its operation, and it is not a gift, nor has it or its use been appropriated, to the public, or to charity, but the title to it is held unconditionally by a private corporation having unrestricted power to use or dispose of it; (2) that it is not supported or maintained wholly or in part upon donations or contributions, but solely upon revenues derived from its actual operation, in competition with all other institutions of the same general class, and at a large profit to the corporation holding unconditional title to it; (3) that by this means it is accumulating a large surplus which it appropriated not to charity but to enlarging its estate, the unconditional title to which is in said corporation; (4) that its dominant purposes and accomplishments are to accumulate corporate profits and increase its corporate assets, and the charity it dispenses is merely incidental to said purposes; (5) that it was not established, nor is it maintained, as a public benefit, and has not that effect, and does not "assume to any material extent that which otherwise might become the obligation of or duty to the community or the State," as was held in Houston v. Scottish Rite to be requisite of an institution entitled to exemption; (6) that it is privately owned, held, and operated, is not by the terms of its charter or otherwise under the con-

trol, regulation, or visitation of the public or public authority, or obligated to dispense any charity, and may at any time wholly abandon its present charities, incidentally dispensed, and divert its properties to any lawful private purpose, or convey it to others who could so divert it. So long as these properties, so created, and accumulated, are so operated and held, and may be so diverted, just so long should they be made to bear their just share of the burdens of the government under the protection of which they were created, are operated, and do thrive.

It was agreed by the parties in the court below that the assessment in question was regularly made, and that the only question to be determined was that of whether or not the property is exempt from taxation. But appellants failed to show the amount of the assessment or taxes due thereunder, or any facts by which the amount can be ascertained. All the other facts in the case are undisputed, and are fully developed, and it would be our duty to, and we would, here render judgment for appellants, if they had but shown the amount of the taxes sued for.

The judgment will be reversed and the cause remanded, with instructions to the court below to ascertain the amount of the taxes assessed, and render judgment for appellants for such amount.

### On Motion for Rehearing.

[14] In the original disposition, the cause was ordered remanded with instructions to the trial court to ascertain the amount of the taxes shown to be due appellees by appellants for the fiscal year 1918, and render an appropriate judgment thereon. This order was made upon the premise that the amount of said taxes were not ascertainable from the record on appeal.

In the court below appellants alleged the amount of taxes to be $3,993.28, and in their trial answer appellees appear to have admitted that the assessment and levy were regular, and the amount to be correctly alleged, although denying liability in toto. Upon the trial, also, appellees agreed that the assessment was regularly made, and in their motion for rehearing make this admission:

"This court erred in remanding this cause, and there is no excuse for remanding it for the reason that if this court's conclusions are correct, then the amount of the taxes is alleged by the petition of the appellants in the trial court and admitted by the answer of appellee in the trial court under oath, and the property is fully described in said petition and such description is confessed to be correct by the answer of appellee under oath."

In this state of the record, we think the matter is made so certain as to warrant this court in rendering the judgment which, in our view of the case, should have been rendered below, and this will be done upon our own motion.

Accordingly, the judgment heretofore entered will be set aside in so far as the cause was ordered remanded, and judgment will be here rendered that appellants recover of appellees the sum of $3,993.28, with 6 per cent. interest thereon from date of judgment rendered below, with foreclosure of lien on the property assessed, and for all costs.

Appellees' motion for rehearing is overruled.

### On Second Motion for Rehearing.

[15] In connection with both their first and second motions for rehearing, counsel for appellees have filed certain pamphlets which they have designated as "Brief and Argument for Appellee in Support of Motion for Rehearing." These documents embrace terms and tones which are so disrespectful and inexcusable as would ordinarily require their exclusion from the files of any court which has a due regard for its dignity and self-respect. The so-called argument is obviously directed, not at the court as such, but more to the individual member of the court writing the original opinion in this cause, and, instead of accomplishing the apparent purpose to avoid offense to the court, emphasizes that offense, and renders it more culpable than if it was directed to the court as a whole. While it is true that the individual member of the court who writes the opinion in any given case is responsible for the language in which the decision is formulated, such decision of the questions disposed of is that of the whole court, unless the contrary is affirmatively shown, and represents the unanimous concurrence of the judges. This is true in the decision of this cause, and it therefore follows as a matter of course that a thinly veiled but persistent intimation that the decision is promulgated by one member of the court, and without the concurrence of the other members, is a reflection upon the court as a whole. This intimation is not the only objectionable feature of the documents mentioned, but is within itself an offense, which the court will not permit to pass unnoticed, in this or any future paper filed here.

[16] This court is not supersensitive, and gentlemen of the bar know that we invite their vigorous argument and forceful criticism, so long as such arguments and criticisms are respectful in language and intent. We ask no more than this; but all of it will be required.

However, out of consideration for the rights of appellees, who, of course, are not responsible for the conduct of their counsel, we have concluded not to strike the objectionable documents from the files of the court, as first intended.

[17] In their motions for rehearing, and

argument thereon, counsel for appellees complain that this court "entirely misapprehends" the whole case, as well as the record, and that the various findings of the court are not only "not supported" by the testimony, but are absolutely "contradicted" by the "undisputed" testimony; that there is "not one word" of testimony to support such findings, etc. If these charges had any basis in fact, there would be some excuse, but no justification, for making them. But they are not based on facts. On the contrary, they are projected upon apparently deliberate misstatements of the holdings and findings of this court, and supported by misstatements purporting to come' from the record. This court is more familiar with the evidence in the record than is counsel, unless counsel has designedly distorted that evidence in urging the motions for rehearing. Although stressed as being of vital importance to the disposition of the case, the matters most bitterly and ill-temperedly presented by counsel are not material to the decision.

Only three witnesses testified upon the trial of this cause, to wit: Mother M. Robert, Sister Wendelimus, and Sister Alcantra, who were at the time president, treasurer, and secretary, respectively, of the Santa Rosa Infirmary Corporation; there is no other testimony in the record, except documentary evidence, consisting of charters and conveyances. It was from this testimony that the statement of the case was made in the original opinion, and a re-examination of the record confirms the accuracy of that statement in all its details. Appellees complain quite bitterly that we have disregarded some of the findings of fact made by the trial court and embraced in the record. We have not, however, disregarded any of those findings where they were supported by any evidence. It was agreed by the parties in the court below "that the sole question for determination in this cause is whether or not the institution owned by defendants is exempt from taxation by reason of the Constitution and laws of the state of Texas," and in determining this question we consider it our duty to look to every undisputed fact in the record, regardless of the findings of the trial court, and that is what we have endeavored to do. Because of the nature of appellees' challenge of our statement of the facts, however, we feel obliged to notice their several contentions, in the order presented:

In the original opinion it was stated that—

Appellee "uses its buildings for four specific but related purposes: First, for general hospital purposes; second, the operation of a drug store; third, the conduct of a training school for nurses; and, fourth, it houses what is known as St. Luke's Clinic, which maintains office quarters and waiting room, and has the exclusive use of six beds, in the infirmary building."

Counsel for appellees bitterly assail this statement, saying, in the course of the 12 or 15 pages devoted thereto, that—

"This statement in the opinion of the court shows that the court entirely misapprehended the record, for this statement conveys the impression that appellee devoted a portion of 'its building to the purpose of a school for the training of nurses generally, presumably for a profit, that appellee operated a regular drug store for the sale of drugs at a profit and that it rented out a portion of its building to an organization called St. Luke's Clinic. The record in the case absolutely contradicts this statement, and the testimony is undisputed. The trial court made no such finding of fact, and we were absolutely astonished when we saw this statement in the opinion of the court."

They further contend that the statements that appellees operated a "drug store," from which it sells drugs to doctors and pay patients, but makes no charge to free patients, and conducted a training school for nurses, and housed the St. Luke's Clinic, for which it collected a nominal rental of $500 a year, are contrary to the undisputed testimony and without any support in the record or the trial court's findings.

1. The statement that appellees operated a "drug store" was based upon the testimony of Sister Wendelimus, who alone undertook to describe this activity, and who said:

"There is a drug store connected with the hospital. The drug store fills prescriptions for the accommodation of the patients and the doctors, at a small profit."

And—

"We * * * had a little drug store for the accommodation of the Santa Rosa patients. * * * The doctor would give a prescription, and we would send it down to the drug store to be filled at a small profit, to cover the expenses of carrying on the drug store, and that profit goes to the general fund of the infirmary."

And again—

"With reference to the drug store, we paid out more for drugs than we got back from patients, because the charity patients were supplied, and the expenses were there, and no income from it."

2. The statement in the original opinion that appellee conducted a training school for nurses was based upon the testimony of Mother Robert, appellee's president, that "Santa Rosa Infirmary is an incorporated institution, and is engaged in hospital work and conducting a practical training course for young ladies for the nursing profession"; that she was "not conversant with the affairs of this school (meaning the Academy of the Incarnate Word), or any other school in San Antonio, except the training school for the nurses attached to Santa Rosa Infirmary." This is all the testimony we are able to find in the record concerning this activity and none other has been called to our at-

tention. If it is true, as appellees now contend, in paragraph 37 of their motion for rehearing, that this training school, admittedly housed in the buildings sought to be exempted from taxation, is not conducted by appellees, but by a separate and distinct corporation, then the fact furnishes an additional reason for denying the exemption. There is no showing that such corporation or activity is one of pure charity, or any sort of charity, and in the absence of such showing, plus the fact that a part of the buildings in question are occupied by it, renders the whole building subject to taxation. Houston v. Scottish Rite, etc., 111 Tex. 191, 230 S. W. 978. Appellees assert that we stated this training school was conducted by them "presumably for a profit," but there is no such statement or intimation in this court's opinion. The fact is that appellees wholly failed to meet the burden upon it to show the facts relating to what this training school is, or how it is operated.

3. It was stated in the original opinion that appellees "house what is known as 'St Luke's Clinic,' which maintains office quarters and waiting room, and has the exclusive use of six beds, in the infirmary building," and that it is "apparent that this clinic is a separate organization from that of the infirmary, to which it pays a rental of $500 a year," which it appears was a "nominal" charge. Appellees' counsel attack this statement and say:

"The undisputed testimony showed that the appellees themselves conducted a free clinic in the hospital building which was called St. Luke's Clinic where surgical operations were performed and treatment given, both absolutely free to patients in cases of eye, ear, nose and throat diseases, and that a contribution of $500 a year as a gift was received by appellees toward helping maintain this department of the hospital. There is not one word in the testimony even tending to show that the department in the hospital known as St. Luke's Clinic was rented out to any one, and in truth and in fact it never was rented nor even thought of being rented to any organization. There is not one word of testimony in the record that the St. Luke's Clinic is a separate organization. It is simply a name that was given to that particular department in the hospital and nothing more."

Appellees again failed to meet the burden resting upon them to show the true character of this clinic or its relation, if any, to appellees, and the statement in the opinion as to what it was, "apparently," is based upon the testimony of Sister Wendelimus, the treasurer, and Sister Alcantra, the secretary, of the Santa Rosa Corporation. Sister Wendelimus testified that—

"The Sisters are in charge of the operating room, in charge of the floors, in charge of the wards, in charge of the maternity department, in charge of the clinic, and in charge of the office. * * * The Santa Rosa Infirmary is the home of the St. Luke's Clinic. The Santa Rosa Clinic was established in 1914 by Bishop Shaw, Dr. Burris and the late Dr. Jackson, to give poor eye, ear, nose and throat patients treatment; it was a source of expense to Santa Rosa Infirmary, and considered an added charity. All patients are received free of charge in that clinic, and are operated on free. The Santa Rosa Infirmary furnishes to the clinic office quarters and a waiting room, and it gives six beds to the exclusive use of St. Luke's Clinic; it furnishes service of nurses daily, and twice a week the use of the operating room with its full staff. St. Luke's Clinic gives a little offering of $500 a year, which would not even cover the rental for one month, if we should put pay patients in. The clinic contributes that much a year; from the clinic fund the gift is made. * * * We had six beds set aside exclusively for charity patients for St. Luke's Clinic, and they made a gift of $500 a year, but that did not maintain it. And when that would be full we would sometimes put patients in the other rooms. The beds of St. Luke's Clinic were in a ward."

And Sister Alcantra testified:

"With reference to the clinic, which was mentioned by the previous witness, they pay $500 a year as a contribution towards the hospital, and the doctors in the clinic receive no pay from the hospital. They do not receive pay in some cases from the individuals they treat; that is all free, purely charity. There is a distinction between the clinic and the hospital proper, in that the hospital is open to both pay patients and charity patients, while the clinic is exclusively for charity patients."

The foregoing constitutes the whole of the testimony relating to the clinic.

4. It was said in the original opinion that—

"During the year in question (1918) 4,471 patients were admitted into the infirmary for treatment, of which 3,482 paid full charges, 436 paid one-half the charges, and 553 paid no charges; in other words, 87½ per cent. of the patients paid, and 12½ per cent. did not pay."

Appellees' counsel petulantly assail this statement, deny it in toto, and say that—

"Laboring under the impression that St. Luke's Clinic was a separate organization, naturally the learned judge who wrote the opinion left out of his calculation all patients that were treated in St. Luke's Clinic. Had he paid any attention to the findings of fact made by the trial judge, and had carefully examined the testimony set forth in the statement of facts supporting the findings of fact made by the trial judge, he would have found that the total number of patients was 4,946 that were received into the hospital during the period beginning on January 1, 1919, and ending December 31, 1919, of which number 2,590 were full pay patients, 123 part pay patients and 2,233 absolutely free patients, thus showing that over 45 per centum of the total number of patients received into the hospital were treated absolutely free of any charge whatever."

The statement so bitterly attacked as being without foundation was taken from this

testimony of Mother Robert, appellees' president, that—

"The total number of patients that were cared for in Santa Rosa Infirmary during the year 1918 was 4,471. The total number of patients who paid full rates during 1918 was 3,482. 436 others paid half rate. The total number of charity patients cared for by Santa Rosa Infirmary during 1918 was 553."

. No other witness testified upon this issue as to the year 1918. Counsel undertake to substitute the figures relating to the year 1918 with those of 1919, but even in that attempt omit the figures which show that in that year the proportion of pay and free service was 87½ to 12½ per cent. respectively, as in 1918. Counsel, in the foregoing extract from their argument, refer to and so garble the testimony of Sister Wendelimus as to create the impression that her testimony shows that—

"Over 45 per centum of the total number of patients received into the hospital were treated absolutely free of any charge whatever."

But counsel very significantly omit the concluding items of Sister Wendelimus' tabulated statement as follows:

Total number of full pay hospital days....... 19,707
Total number of part pay hospital days........ 1,029
Total number of free hospital days............ 2,984

Total number of hospital days,............. 23,720

Approximate daily average of full pay patients... 54
Approximate daily average of part pay patients.. 3
Approximate daily number of free patients........ 8

Approximate total daily average of patients.. 65

From the foregoing table it appears that of the 23,720 "hospital days" for the year 1919, 12.58 per cent. were devoted to free patients, and 87.42 per cent. to pay patients; whereas, in 1918 the per cent. was 12.50 and 87.50, respectively. And less than one out of every eight patients was free, the same proportion as in 1918. No other witnesses than those quoted testified upon this issue, and all of their testimony is here shown.

5. It was stated in the original opinion that—

"On the amount invested, $125,000, the net profits thus amounted in 1918 to nearly .30 per cent., in 1919 to nearly .28 per cent., and in 1920 to .38 per cent."

To which counsel for appellees make this reply:

"We ask the question, where does the learned judge of this court, who wrote the opinion of the court in this case, find the evidence supporting his proposition that $120,000 was the value of the property that was conveyed by the Sisters of Charity of the Incarnate Word to the Santa Rosa Infirmary Corporation on the 1st day of March, 1919? If the court will examine the record, they will find that there was no testimony whatever introduced that showed that the property conveyed to the Santa

249 S.W.—33

Rosa Infirmary Corporation was worth only $120,000 at the time the same was conveyed, to wit: On March 1, 1919, no issue whatever was made in the trial court as to this, and, so far as the record is concerned, we are warranted in assuming, and we could have proved by undisputed testimony, that the property at the time of such conveyance was really worth at least the sum of $480,000, and that, outside of the $120,000 that was to be paid by the Santa Rosa Infirmary Corporation, the balance, $360,-000, was a pure donation by the Sisters of Charity of the Incarnate Word to the charitable purposes set forth in the charter of the Santa Rosa Infirmary. * * * As a matter of fact, if the issue had been raised and should have been deemed material by the trial court, the appellees could and would have proved that the property was worth more than three times said amount at the time the same was conveyed to the Santa Rosa Infirmary Corporation by the Sisters of Charity of the Incarnate Word."

It will be noted that, pursuing the course which marks their entire argument, counsel have deftly misquoted the opinion so as to show our computation to be based upon the "value" of the property; whereas, as will be seen, it was based upon the "investment." Ordinarily this subtle substitution would destroy the computation, but it has no such effect here, as will be seen. The statement complained of is based upon the testimony of Mother Robert, appellees' president, who testified:

"The value of the property of the Santa Rosa Infirmary, when conveyed to the Santa Rosa Infirmary Corporation (March, 1919), was $125,000. The present value (May, 1922) of the property is about $200,000 more or less. * * * The new hospital is to be erected adjoining the present Santa Rosa building, on West Houston street; the approximate cost of the new hospital building will be $250,000, and the approximate cost of the equipment will be $50,000 additional. The Mother House of the Congregation of the Sisters of the Incarnate Word has agreed to advance the necessary funds, other than the amount on hand in the 'Building Fund,' to build and equip the new hospital, and we have agreed to repay such advance. * * * In my judgment, owing to the fact that the buildings are old, a fair market value for them would be from $200,000 to $300,000. This valuation does not include, however, the value of the new building now under construction. * * * Yes, this vendor's lien note in the sum of $125,000 (the consideration for the conveyance) is held by the Congregation of the Sisters of Charity of the Incarnate Word as a bona fide and binding obligation, and the Congregation of the Sisters of Charity of the Incarnate Word expect due payment."

There is no other evidence in the record on these issues.

6. It was stated in the original opinion that none of the infirmary's current revenues are derived from charitable or other donations or contributions, but solely from charges made against its pay patients. Counsel for appellees assert that there is absolutely

no testimony to support this statement, which "is squarely contrary to the record," and then inquire, "Where did the judge who wrote the opinion in this case find the testimony to this effect?" The statement was based upon the testimony of Mother Robert, appellees' president, and Sister Alcantra, its secretary. The former testified:

"The infirmary has no other source of revenue than that derived from pay patients. * * * The funds derived for the maintenance, upkeep and improvement of the hospital facilities are derived solely from receipts from pay patients."

And Sister Alcantra testified that—

"The institution is entirely self-sustaining, and it is not in any way dependent on outside charity, or solicitation from other organizations connected with the church; it is derived solely from pay patients."

This is all the testimony in the record on the question.

7. Counsel assert that the cases cited by them and analyzed in the original opinion were cited, some of them to show rules of construction, others to show definitions of "charity," of "public," etc., and were not all claimed to be "applicable in all respects to the case at bar." It is true that many authorities were used in appellees' brief on these incidental questions, but all those analyzed in the opinion, and no others, were cited under this specific proposition of appellees:

"(G) However, regardless of rules of construction above referred to, the appellees, under the evidence of this case, undisputed and uncontradicted, are 'institutions of purely public charity,' and the hospital and infirmary property therefore exempt from taxation under our constitution and statutes."

As will be seen from the original opinion, the authorities cited under this proposition negative it either directly or by analogy.

Appellees' second motion for rehearing is overruled.