SHAKER MEDICAL CENTER HOSPITAL, APPELLEE, *v.* BLUE CROSS OF
NORTHEAST OHIO, APPELLANT.

(No. 26032—Decided June 28, 1962.)

*Messrs. Marshman, Hornbeck, Hollington, Steadman & Mc-Laughlin*, for appellee.

*Messrs. Jamison, Ulrich, Hope, Johnson & Burt* and *Messrs. Thompson, Hine & Flory*, for appellant.

HURD, J.   This action originated in the Court of Common Pleas wherein Shaker Medical Center Hospital (hereinafter called the plaintiff) filed its petition against Blue Cross of Northeast Ohio (hereinafter called Blue Cross) praying for a mandatory injunction to compel Blue Cross to enter into a contract with plaintiff for hospital services furnished by plaintiff to Blue Cross subscribers who were patients of the plaintiff. The trial court, without opinion, granted the mandatory injunction as prayed for by the plaintiff.   The cause now comes to this court by way of appeal on questions of law and fact.   The case is here heard on the record and exhibits introduced in the trial court.

At the outset we think it proper to state that the plaintiff, in order to sustain the averments of its petition, has the burden of proof under the familiar doctrine that he who affirms must prove.

There is no dispute as to the essential facts which are shown by testimony in the record and by documentary evidence submitted by Dr. Victor D. Ippolito (hereinafter called the Doctor) in answer to interrogatories submitted by Blue Cross.

The plaintiff filed its articles of incorporation with the Secretary of State as a corporation not for profit on November 13, 1961, for the specific purpose of operating a hospital with facilities at 11790 Shaker Boulevard, Cleveland, Ohio. The building now housing the hospital was built by the Doctor originally as a two story medical building some six years ago. The owner and landlord of the building is Lee-Allan, Inc., an Ohio corporation for profit owned by the Doctor and his family.

The Doctor leased offices and suites in the building to a number of physicians, a drug store, an X-ray office and, on the second floor, offices for himself and other physicians and dentists. Exclusive of the hospital, this real estate development has a total of sixteen tenants who pay the Doctor as landlord an annual rental of $75,036.

The building was built with a steel construction that would permit the addition of a third floor. About two years ago, the Doctor began the design of a third floor which could be used as a hospital. The third floor is now constructed and embraces a thirty-one bed hospital facility. The Doctor stated that his purpose was to have a building where there was a doctor and all different specialities of medicine. The Doctor, before opening the hospital, made application for Blue Cross services and was advised that the hospital facility, as organized, was not eligible for such services.

The Doctor, together with Charles Rehor, who is his accountant, and Dr. Castrigano, a dentist, were the only incorporators of the plaintiff as a nonprofit Ohio corporation and these incorporators were and still are the only incorporators of the corporation and, as such, they retain the exclusive right to elect the corporation's board of trustees. Since the initial meeting of the incorporators, there has been only one meeting of the members, at which time certain changes were made in the origi-

nal six-man board. At that meeting, held on February 27, 1962, four weeks after the initial rejection by Blue Cross of plaintiff's application for a Blue Cross contract, the members accepted the resignation of one trustee and elected two additional trustees. Therefore, the board is presently composed of seven men.

At the initial meeting on November 20, 1961, the Doctor became the chairman of the board of trustees and president of the corporation, and Mr. Rehor, the accountant, became the secretary of the corporation.

Article III, section 3 of the constitution of the medical staff (plaintiff's exhibit 26) requires the approval of the board of trustees before a person can become a member of the staff. The record shows that there has been no formal meeting of the board of trustees for the purpose of approving of a single doctor to become a member of the staff of plaintiff. The Doctor considers himself to be the administrator of the medical staff, according to his testimony at the trial. The Doctor is president of Lee-Allan, Inc., and the owner of all the voting stock. On January 3, 1962, the plaintiff entered into a lease covering the third floor of the building. The lease was executed on behalf of Lee-Allan, Inc., by the Doctor's daughter, Jean DiSanto, and by the Doctor on behalf of the plaintiff. It appears to be undisputed in the record that the profit corporation, Lee-Allan, Inc., owned by the Doctor, is obtaining an ordinary income profit annually under its lease to the plaintiff hospital which is also controlled by the Doctor and that the lease was negotiated with the Doctor as the principal figure on both sides of the transaction. It is thus apparent that the Doctor controls both the lessor and the lessee, and that he is the dominant figure in the hospital enterprise.

The plaintiff hospital does not have a clinical laboratory. Instead all its laboratory work, including pathological and clinical examinations and tests, is subcontracted out to the clinical laboratory located on the first floor of the building and is owned and operated for profit by the Doctor. The laboratory's charges to the hospital are based on charges made for similar work done at Suburban Community Hospital, and are competitive with charges made by commercial laboratories in Cleveland. The profit derived from the laboratory operation is a personal profit to the Doctor. The record shows that the Doctor established this laboratory in October of 1961 for his own use and for the

use of other doctors in the vicinity, and for the new hospital then under construction. He employs a pathologist, a technician, and an assistant. The laboratory is not only available to the Doctor in his private practice but is a commercial enterprise owned by him and used by other doctors who require the examinations and reports which it is in a position to provide.

The plaintiff hospital does not have an X-ray department. Its X-ray work is also subcontracted out to an X-ray laboratory located on the first floor of the building and is owned and operated by the Doctor. The Doctor owns the X-ray equipment, employing two radiologists, a technician and a helper to operate it and to provide X-ray services. The Doctor, as owner of the X-ray operation, negotiated a contract with himself, as administrator of the hospital, for X-ray services at a schedule of charges based on charges for similar services at Marymount Hospital. This commercial X-ray operation was established on the first floor of the building when it was opened. It has also provided services in connection with the Doctor's private practice and has sold X-ray services to other doctors in the vicinity.

The plaintiff hospital does not own equipment for taking electrocardiograms. Such examinations and their interpretations are done by the laboratory owned and operated as a commercial venture by the Doctor.

Before the trial of the case below, the plaintiff submitted to Blue Cross for payment twenty-two statements for services furnished to patients who were discharged from the hospital prior to March 14, 1962. The Doctor was the attending physician in twenty-one of the twenty-two cases submitted to Blue Cross for payment. The plaintiff hospital's charges to these patients totaled $7,187.17, out of which the Doctor's concessions would have received $1,310 for X-ray services, $865.50 for laboratory services and $200 for electrocardiograms. Taking the hospital charges alone to be paid for by Blue Cross, the Doctor's profit for the ventures would be $2,375.50, or thirty-three percent of the total hospital bills to the patients who were subscribers of Blue Cross. These are direct payments to his concessions and do not include that portion of the total charges of the hospital to be ultimately allocated for rent to be paid to the Doctor's Lee-Allan, Inc. (a profit corporation) as the lessor of the hospital facility. Further, these payments do not include any amount

paid to him as a professional fee for his services as a surgeon.

The hospital facility is complete with kitchen, operating room, recovery room and apartment for resident physician.

The first question for our determination is whether or not the plaintiff is a "nonprofit hospital" as that term is used in Section 1739.06, Revised Code, and is thereby entitled to the benefits of that statute.

It appears to be the contention of the plaintiff that because it is incorporated not for profit that this is determinative of the issue in this court. With this contention, we do not agree.

There is no dispute that Blue Cross falls within the statutory definition of Section 1739.01 (A), Revised Code, which provides as follows:

"(A) 'Hospital service association' means any corporation organized not for profit under Sections 1702.01 to 1702.58, inclusive, of the Revised Code, for the purpose of establishing, maintaining, and operating a nonprofit hospital service plan by which hospital care may be provided by a nonprofit hospital, or by a group of such hospitals, with which such corporation has a contract for such purpose, to such of the public as become subscribers to said plan under a contract which entitles each subscriber to hospital care."

However, the controlling statute in determining whether a hospital is a "nonprofit hospital" is Section 1739.01 (B), Revised Code, which provides:

"(B) 'Nonprofit hospital' means any hospital *operated not for profit* in this state which maintains an establishment for the medical or surgical care of bed patients for a continuous period longer than twenty-four hours, *which is open to the general public twenty-four hours each day for emergency care*, which has a minimum of ten patient beds, which has an average of two thousand patient days per annum, and which has on duty a registered nurse twenty-four hours each day." (Emphasis added.)

Considering the record as a whole and applying the provisions of Section 1739.01 (B), Revised Code, to the facts of the case, we are of the opinion that the plaintiff does not qualify as a hospital operated *not for profit* under the provisions of the statute and, therefore, cannot qualify as a "nonprofit hospital."

It is apparent from the record that while the plaintiff is in-

corporated not for profit, nevertheless, *the determination must be made by what the plaintiff does rather than what it professes to be.* There can be no question that this hospital is a proprietary hospital operated at a profit for the Doctor's benefit by his retention of the many concessions above described by reason of which it must be distinguished from what are sometimes denominated as community fund type hospitals which are operated not for profit as charitable institutions for the benefit of the patients served by them. In the latter type of hospitals, services include clinical laboratories, X-ray departments, departments for electrocardiograms, and drug departments as part of the hospitals' services. Thus any profit derived from these laboratories and departments inures to the benefit of the hospital alone and such benefits redound to the profit of the hospital service as a whole. Undoubtedly, under the provisions of the statute above cited, Section 1739.01 (B), the type of nonprofit hospital intended by the Legislature to be serviced by Blue Cross must be distinguished from the proprietary type of hospital involved in the instant case where the profits from the various concessions inure to the benefit of the Doctor alone who is the managing head and sole owner of the hospital.

The defendant has cited and quoted from certain cases which although dealing with exemption from taxation, by analogy, are applicable here as bearing upon the question of whether a hospital is being operated for profit though incorporated not for profit.

In *State* v. *Willmar Hospital, Inc.*, 212 Minn., 38, 2 N. W. (2d), 564, two doctors and their wives owned what was designated as the Branton Foundation, Inc., a nonprofit Minnesota corporation. Willmar Hospital then sold to Branton Foundation hospital property and equipment but *the doctors also owned an electrocardiograph, a basal metabolism machine, and an X-ray machine, all of which they kept and with their two associates used in the hospital.* Other doctors used this equipment in the hospital upon payment of the fees to the owners. The issue was whether the foundation operation was being used for private profit so as not to be exempt from personal property taxes. The court held that the corporate charter was not decisive of the foundation's nonprofit character by stating the following:

"Defendant contends that its character as an institution of purely public charity is conclusively determined by its articles

of incorporation and that it is not permissible to inquire into the use which it makes of its property for which it has been taxed. *The state contends that its character is to be determined by what it does as well as by what it professes to be.* * * * The right to exemption depends upon the concurrence of the institution's ownership and use of the property for the purposes for which it was organized. *State v. St. Barnabus Hospital*, 95 Minn., 489, 104 N. W., 551; *Jones v. Conn.*, 116 Ohio St., 1, 155 N. E., 791; annotation 34 A. L. R., 635. *By the same token, where the property claimed to be exempt is subject to private control and is devoted to substantial use for private profit it is not exempt.* *Betts Hospital, Inc., Appeal, supra*; *City of San Antonio v. Santa Rosa Infirmary* (Tex. Civ. App.), 249 S. W., 498; *Bistline v. Bassett*, 47 Idaho 66, 272 P., 696, 62 A. L. R., 323, and annotated at p. 328.'' (Emphasis added.)

This furnishes an exact parallel to the instant case where the Doctor retains the concessions described at a profit to himself.

In *Bistline v. Bassett*, 47 Idaho, 66, 272 P., 696, 62 A. L. R., 323, it appears that a profit-making corporation controlled by two doctors owned a hospital. Thereafter the doctors incorporated a nonprofit benevolent association and transferred the hospital equipment to the nonprofit corporation. The two doctors, however, controlled the nonprofit corporation and were two of its three directors. They used the hospital and equipment in their private practice although they derived no profit from the hospital operation and even personally made up for its annual deficits. The issue there was whether the property was exempt from taxation as a hospital used for benevolent purposes ''from which no profit is derived.'' The court there noted that the exemption depends upon the use of the property and not upon the ownership or the character, charitable or otherwise. The court held, in part, as appears at page 72:

''*But where a dominant and substantial use is pecuniary advantage to individuals who have the hospital under their management and control, it is not a use for benevolent purposes, or without profit within the meaning of the statute.*'' (Emphasis added.)

This case was quoted with approval by the Supreme Court

of Ohio in *Cullitan, Pros. Atty.,* v. *Cunningham Sanitarium,* 134 Ohio St., 99, wherein at page 102, it is stated:

"It is disclosed by the record that, though some of the patients admitted to the sanitarium did not pay for the treatment received, one purpose, if not the principal purpose of the plan heretofore referred to was to use The Cunningham Sanitarium to promote the sale of stock and the establishment and erection of similar bowls elsewhere throughout the country. The Cunningham Sanitarium was thereby made the beneficiary of a part of the proceeds of the sale of stock with the very apparent purpose of using it not for the purpose of making money directly out of that institution itself, but rather from the erection of similar bowls in various parts of the country. This indicates a use not exclusively for charitable purposes. Where use is a criterion of exemption of property from taxation, the exemption is lost if the property is appropriated to other uses. *Bistline* v. *Bassett, et al., Bd. of Equalization,* 47 Idaho, 66, 272 P., 696."

To the same effect, see *Betts Hospital, Inc., Appeal* (Pa.), 27 Northhampton County Reporter, 69; *Prairie Du Chien Sanitarium Co.* v. *Prairie Du Chien,* 242 Wis., 262, 7 N. W. (2d), 832, 144 A. L. R., 1480; *Raymondville Memorial Hospital* v. *State* (Texas), 253 S. W. (2d), 1012.

These cases are authority for the proposition that it is not the form of the articles of incorporation that is controlling but rather the manner in which the hospital is operated. If it is operated in such a manner as to bring profit, even though indirect, to those who manage and own the hospital, it cannot qualify as a charitable or benevolent institution. Applying this test in the instant case, it is crystal clear that the plaintiff is not eligible for the services of Blue Cross.

The plaintiff, by way of brief, argues that the proper remedy of Blue Cross, if any, is by way of an action in quo warranto. In our opinion such an argument is irrelevant to the issue here presented. The single issue is whether the court may, by mandatory injunction, require Blue Cross to contract with plaintiff under the provisions of Section 1739.06, Revised Code. Blue Cross naturally has no objection, and in fact can have no objection, to the operation of the hospital facility in connection with the Doctor's practice of medicine. The sole objection by Blue Cross is to a compulsory or mandatory order requiring Blue

Cross to finance his operation of the hospital facility where obviously this facility is ineligible for Blue Cross services under the provisions of Section 1739.01 (B), Revised Code.

Aside from the proposition that the hospital is not a charitable institution operated not for profit, it will be noted from an examination of Section 1739.01 (B), Revised Code, that a hospital to be eligible for Blue Cross services must maintain an establishment for the medical and surgical care of bed patients for a continuous period of twenty-four hours each day and which must be open to the general public twenty-four hours each day for emergency care.

The record shows that the plaintiff does not qualify in this respect for Blue Cross services inasmuch as it has not proved that it meets the specific requirement that it is open to the general public twenty-four hours each day for emeregency care.

The record shows that the building on the third floor of which the hospital is located is locked on the first floor at or about the time the occupants' guests visiting on the first and second floors leave the building, which is about ten o'clock every evening. It remains locked until about seven o'clock the next morning. There is a button at the front door which rings a bell on the third floor which could summon someone to the front door during the period it is locked. We do not consider that such an arrangement meets the requirement of the statute.

Further, the principal facilities of the hospital being located on the third floor can be reached only by an elevator or by the stairways. The cab of the elevator is so small that it would accommodate only a wheelchair and an attendant. It is too small to accommodate a stretcher patient. This means that a cardiac patient or any other patient whose condition requires stretcher care and who must remain in a prone position cannot reach the hospital by way of the elevator. Thus, it appears from the evidence that the plaintiff lacks the facilities for emergency care required by the statute and the facilities that it has are not open for emergency care twenty-four hours each day.

The provisions of the statute cannot be enlarged or disregarded by a court. The law as it stands is the work of the Legislature and this court cannot vary the plain meaning and terms of the statute which is unambiguous, so that in this particular

provision of the statute, the plaintiff again fails to qualify for Blue Cross services.

The holding of the trial court, if it were to be sustained, would have a serious and detrimental effect upon Blue Cross. For if one doctor can set up a proprietary institution such as that in the instant case, the precedent will be established for other doctors to do likewise. It is not too much to assume that under such an operation the entire Blue Cross system for the state of Ohio could ultimately fail to meet its responsibilities to the charitable institutions which it now serves.

However, we reiterate that the principal point at issue is that it is not sufficient for a hospital to be *incorporated not for profit* but it must be *operated not for profit* in order to qualify for Blue Cross services and must comply in all respects with the provisions of Section 1739.01 (B), Revised Code.

It is our conclusion from the facts of the case and the law as applied thereto as contained in Section 1739.01 (B), Revised Code, that a judgment must be entered in favor of the defendant, Blue Cross.

*Judgment for defendant.*

KOVACHY, P. J., and SKEEL, J., concur.